644 So.2d 839 (1994)
Dr. Jerry R. ADKINS
v.
BURRIS MILL & FEED, INC., and David H. Burris.
No. 93 CA 1908.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Writ Denied January 6, 1995.
*840 Stacey Moak, Baton Rouge, for plaintiff-appellant-appellee.
Michael A. McGlone and Bryan C. Misshore, New Orleans, for defendant-appellee-appellant.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
SHORTESS, Judge.
Jerry R. Adkins (plaintiff) owned a thoroughbred racehorse farm in Loranger, Tangipahoa Parish, Louisiana, known as Camelot Farm. During the last week of 1989, eleven of plaintiff's sixty-five horses died of leukoencephalomalacia (leuko), a disease caused by ingestion of a toxin, fumonisin B-1, found in *841 moldy corn. Plaintiff purchased feed containing corn, which the horses ate prior to their deaths, from Burris Mill and Feed, Inc. Laboratory tests showed the feed contained the toxin.
Plaintiff sued Burris Mill and Feed, Inc., its owner, David H. Burris (collectively, Burris), and their alleged insurer, The Travelers Insurance Company (Travelers). Burris filed a cross-claim against Continental Grain Company, Inc. (Continental), which sold it the corn used in the feed.[1] Plaintiff then joined Continental as an additional defendant.
Plaintiff settled with Burris and Travelers before trial. Burris prosecuted its cross-claim at trial, seeking to recover the $50,000.00 it paid to plaintiff in settlement. The jury was presented with two sets of interrogatories, one as to plaintiff's claims and another as to Burris's claims. As to plaintiff's claims, the jury found that Continental was a manufacturer, that corn has a characteristic which causes it to be unreasonably dangerous as horse feed, that the conduct of plaintiff and/or his farm manager caused or contributed to the death of the horses, and that Continental's conduct did not damage plaintiff. As to Burris's claim, the jury found Continental was a manufacturer, that corn has a characteristic which causes it to be unreasonably dangerous as horse feed, that Continental failed to adequately warn Burris of this dangerous characteristic, that Continental did not guarantee the fitness of its corn for use in the manufacture of horse feed, that the corn purchased by Burris did not contain a redhibitory defect, that the conduct of plaintiff, Burris, and Continental contributed to the death of the horses in the percentages of 10%, 75%, and 15%, respectively, and that Continental had not damaged Burris. The jury awarded no damages to either plaintiff or Burris.
The trial court entered judgment in accordance with the jury verdict, dismissing the claims of plaintiff and Burris. The court withheld assessment of costs until after a rule to tax costs. Plaintiff then filed a motion for judgment notwithstanding the verdict (JNOV), or additur, or partial new trial. Burris also moved for JNOV or, in the alternative, new trial. Plaintiff also filed a motion for the trial court to fix the amount of sanctions previously awarded to him and Burris on a discovery motion. Continental filed a motion to tax costs.
In written reasons the trial court fixed the amount of sanctions against Continental in favor of plaintiff in the sum of $4,735.43 and in favor of Burris in the sum of $4,056.16. It fixed court costs at $3,469.15 without specifying against whom they were to be assessed. The court denied plaintiff's motion for JNOV, additur, or new trial, but granted Burris's motion for JNOV, awarding it 15% of the amount it paid plaintiff in settlement, plus attorney fees.
Continental, apparently assuming the assessment of court costs was in its favor since it was the prevailing party, filed a motion for reconsideration of the amount of costs, complaining that the court failed to include $1,200.00 which it paid as jury costs. In a "Final Judgment," the court denied the motion for reconsideration and taxed Continental with all costs.
Continental settled with Burris following the "Final Judgment." Plaintiff appealed, contending that the trial court erred in failing to grant his motion for JNOV, and that the jury erred in failing to award him damages and in finding his fault contributed to the death of the horses. Continental answered the appeal, contending that the jury erred in finding it was a manufacturer, and that the trial court erred in failing to tax costs to plaintiff, including the $1,200.00 in jury fees, and in awarding sanctions to plaintiff on the pretrial discovery motion.

SANCTIONS ON DISCOVERY MOTION
Continental contends the trial court erred in awarding sanctions against it in connection with corporate depositions, and, alternatively, that the sanctions awarded were excessive. However, Continental failed to order a transcription of the hearing and, thus, there is nothing in the record for us to review. It was Continental's responsibility *842 to ensure a complete record on the issues it appealed. We must presume the trial court's ruling was correct if an inadequate record is transmitted. Ronald Adams, Contractor, Inc. v. State, 464 So.2d 1003, 1004 (La.App. 1st Cir.1985). Thus, this assignment of error is without merit.

PLAINTIFF'S MOTION FOR JNOV
The jury, in answer to special interrogatories, found that Continental was a manufacturer and that corn has a characteristic which causes it to be unreasonably dangerous as a feed for horses. However, it answered "no" to the question "Do you find that Continental Grain Company's conduct has damaged Dr. Jerry R. Adkins?" Plaintiff contends this is an inconsistent verdict.
In denying plaintiff's motion for JNOV, the trial court stated: "The Court believes that the jury felt that Dr. Adkins had been adequately compensated for his horses [by his settlement with Burris]. The Court find[s] that the jury made an error but the result was correct." Later in its written reasons, in addressing Burris's motion for JNOV (which it granted), the court stated:
The jury's answers to the interrogatories indicate to the court that the jury became confused by the testimony that Dr. Adkins had already received $82,000.00 from Burris and its insurance company. The jury answered the interrogatories inconsistently finding that Dr. Adkins suffered no loss as a result of the death of eleven thoroughbreds. Reasonable men could not reach such a conclusion.
When the trial court, after considering all of the evidence in the light most favorable to the party opposing the motion, finds the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict, the motion for JNOV should be granted. Anderson v. New Orleans Public Service, 583 So.2d 829 (La. 1991); Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.), writ denied, 577 So.2d 1009 (La.1991). Having found that the jurors answered the interrogatories inconsistently and that reasonable jurors could not conclude plaintiff suffered no damage as a result of the death of his horses, the trial court committed legal error in denying plaintiff's motion for JNOV.

IS CONTINENTAL A MANUFACTURER?
Continental contends that the jury was clearly wrong in finding it was a manufacturer and, thus, that it is not liable to plaintiff for the death of his horses. The jury's factual determination that Continental is a manufacturer can be reversed only if it is manifestly erroneous. If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880, 883 (La.1993).
"Manufacturer" is defined in Louisiana Revised Statute 9:2800.53(1), which reads in pertinent part:
"Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:
. . . .
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(Emphasis added.)
The product which caused damage in this case is corn, or, more specifically, corn screenings. Corn screenings are a by-product of the transportation, loading, and cleaning processes involved in selling corn. According to Jerry Gibson, plant manager of Continental's export grain elevator in Westwego, Louisiana, whole corn tends to break up as it is handled. When corn is received by Continental at its export silo, it may be dried to achieve the proper moisture content. It may also be cleaned by large mechanical cleaners which consist of several lawyers of large shifting screens. The fine pieces of broken corn, along with husk and cob fragments *843 and weed seeds, are sold as corn screenings.
Both Gibson and Jaeson M. Brown, vice president of operations and engineering for Continental's North American Grain Division, testified that drying and cleaning affect the quality of the corn. Gibson testified:
Q. And to do that quality thing to affect the quality you have to dry grain....
A. Right, and to meet certain contract specifications.
. . . .
Q. Is virtually all of the corn you receive run through the screen?
. . . .
A. Depending on the cornthe quality the amount of corn screenings, the amount of broken in the corn when we receive it.
Q. Again an effort to affect the quality of the corn?
A. Yes, to meet specifications.
Brown testified:
We see quality changes, yes, within our handling system, within our storage system; that does occur.
But remembering the fact that we're buying a quality at a price and we're selling a quality at a different price or another price, we've got to try to ensure the quality throughout that chain.
If that means drying grain or cleaning grain as we handled it, yes, we do those types of things.
Based on the evidence and, in particular, the testimony of these two Continental employees, it was certainly a permissible view for the jury to conclude that Continental was a manufacturer. This assignment of error is without merit.

WAS PLAINTIFF CONTRIBUTORILY NEGLIGENT?
Plaintiff contends the jury erred in finding that his fault contributed to the death of his horses and in assessing him with 10% of the fault. The interrogatory on plaintiff's claim asked: "Do you find that the conduct of Dr. Jerry R. Adkins and/or Richard R. Barber caused or contributed to the death of the horses?" The jury checked "yes." There was no apportionment question on that interrogatory form. However, the jury interrogatories on Burris's claim asked: "If you have found that the conduct of Burris Mill & Feed, Inc. AND/OR Jerry Adkins AND/OR Continental Grain caused or contributed to the death of the horses assign percentages of fault if any to the following:" Beside plaintiff's name, the jury wrote: "10%."
Plaintiff contends that if these two sets of interrogatories are taken as a whole, and thus the 10% finding of fault is assessed to him on his claim against Continental, that finding is clearly wrong. We believe these two sets of interrogatories must be taken as a whole because Continental was urging the contributory negligence of plaintiff as a defense, and obviously they intended to submit the question of plaintiff's negligence to the jury.
In Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, 93-3110, 93-3112, pp. 5-6 (La. 7/5/94), 639 So.2d 216, 220-221, the supreme court stated it is a Louisiana appellate court's constitutional duty to determine not simply whether there is a reasonable factual basis for the finding of the trial court, but whether the verdict was "clearly wrong based on the evidence, or clearly without evidentiary support."
Our review of the record finds no evidentiary support for a finding that the actions of plaintiff or his farm manager, Richard Barber, constituted legal fault in this matter. We note the jury was not asked whether plaintiff's or Barber's fault was a legal cause of the horses' deaths. The jury could have concluded Barber's conduct in feeding the tainted feed to the horses was a cause-in-fact of their deaths, but it was not a legal cause.
Barber had been plaintiff's farm manager for over fifteen years before the horses' deaths. He had attended two seminars on nutrition, but in neither seminar had he been advised not to feed corn to horses. He did not specify to Burris the particular ingredients to be incorporated into the feed; he was concerned more with the total digestive nutrients and proteins. He stated he left the *844 feed mixing to the experts. Before the first of plaintiff's horses was diagnosed with leuko, he had not heard that feed containing corn could cause problems with horses. He discontinued feeding the tainted feed to plaintiff's horses immediately after he was advised it was causing the leuko outbreak.
Claude Stephenson, a veterinarian who regularly treated plaintiff's horses, testified he never warned plaintiff's employees that leuko was a potential danger. He stated that any veterinarian should know moldy corn can cause leuko in horses, and that horse farm managers and horse owners should be aware of this. However, he testified that this fact was not well-known throughout "the horse community" in 1989, and that he doubted a farm manager's periodicals would have included this information.
Plaintiff testified that before this lawsuit he thought all horse feed was made from good grade corn. He relied on Burris to provide him with the best feed available. Before his horses died he had not heard of other horses in the area having problems with leuko. He had never read that corn should not be fed to horses.
Dr. Steve S. Nicholson, an associate professor of veterinary toxicology at the Louisiana State University (LSU) School of Veterinary Medicine, testified that it is common knowledge among veterinarians that feeding corn to horses creates a risk of leuko, but that many horse owners have not heard about leuko or the potential danger of feeding corn to horses.
Hershel F. Morris, Jr., head of the feed and fertilizer laboratory at LSU and Director of Agricultural Chemistry with the Louisiana Department of Agriculture, stated the Department of Agriculture did not issue warning letters to consumers, manufacturers, or feed dealers after he became aware that horses were dying of leuko in 1989. Kyle T. Williams, editor of Louisiana Horse Magazine, the official publication of the Louisiana Thoroughbred Breeders Association, testified that the first article about leuko to appear in that magazine was in the December 1989 edition, which was not received by subscribers until after the death of plaintiff's horses.
Not only was there no evidence that plaintiff and Barber knew about the relationship between corn and leuko, even if they had known, the expert testimony indicated it would not have not been negligence to feed corn to horses absent knowledge of a leuko outbreak in plaintiff's geographic area. Gary E. O'Neal, a veterinarian, stated that products containing corn are a common ration for horses, and he has never recommended to any of his clients that they not feed whole corn products to horses. John C. Reagor, the head of the Department of Toxicology at the Texas Veterinary Medical Diagnostic Laboratory, stated that although leuko outbreaks were being reported to him from widespread areas of the United States in October 1989, he continued to feed his own horse feed containing corn because there had been no cases reported in his area.
Having found no evidentiary basis for the jury's finding of 10% fault of the plaintiff, we find it is clearly wrong and reverse that finding.[2]

PLAINTIFF'S DAMAGES
We now must determine the amount of damages which plaintiff is due. The parties stipulated plaintiff incurred veterinary expenses in connection with the deaths of the horses totaling $1,765.00.[3]
Plaintiff contends he is also entitled to be compensated for the value of the eleven horses, his mental anguish, and for Camelot Farm's loss of reputation. Plaintiff testified that before "this word got out" he was boarding up to ten mares at a time to be bred to Dansons. At the time of trial he was boarding only one or two at a time because horse owners were afraid their horses might die if they brought them to Camelot Farm. Plaintiff's testimony is corroborated by that of Williams of the Louisiana Thoroughbred *845 Breeders Association. Williams stated records are kept on the number of horses sired by a stallion, and those figures are published in every edition of Louisiana Horse Magazine. Williams testified that before plaintiff's horses died, Dansons was usually in the top five, and always in the top ten, on the list of most prolific sires. At the time of trial, however, Dansons was not ranked at all.
Plaintiff suffered the loss of four thoroughbred mares who were due to drop foals in a few months and seven weanlings, horses who were less than one year old.[4] Three of the mares had been bred to plaintiff's stallion Dansons, and the fourth mare, whose father was Dansons, had been bred to another stallion at a cost of $1,500.00. Plaintiff testified that when he met with a representative of Burris soon after the horses' deaths, he placed a "bone bargain barren price" on the horses of $119,000.00. He testified that figure did not take into account that the mares were all in foal. Three of plaintiff's mares had been bought in Kentucky for a total purchase price of $34,700.00. Plaintiff testified one of those mares had increased in value since her purchase because she had produced a very good stakes-placed colt and was considered a "very hot" bloodline. The eight remaining horses had been raised on plaintiff's farm.
Stuart Barringer testified as plaintiff's expert appraiser. He has been in the livestock business for thirty-three years and has been in the livestock insurance business for thirteen years. He also puts on horse sales, acts as a thoroughbred blood stock agent, and puts on seminars at race tracks for new owners. In connection with his business of insuring the lives of horses, he determines the value of horses on a daily basis. In determining the value of plaintiff's horses, he evaluated their pedigrees and, in the case of the broodmares, their ability to bear foals. Barringer placed an actual cash value of these eleven horses at the time of their deaths at $125,000.00.
Phil T. Owens, a thoroughbred bloodstock agent, testified as Continental's expert appraiser. Owens worked for Bloodstock Research, a thoroughbred brokerage, until approximately 1975. He and this brother then formed their own bloodstock agency. He had never participated in buying or selling thoroughbred horses in Louisiana. Owens testified that the fair market value of the horses at the time of their deaths was $44,200.00. In determining the values of the mares, he took into account the racing records of the mares' progeny for three years after their deaths. He also reduced the values of the three mares who were in foal to Dansons because, contrary to the testimony of plaintiff and Williams, he thought the stallion was not a stud whose services were in demand.
We specifically reject the argument of Continental that because plaintiff had taken tax losses since 1980 on Camelot Farm which totaled approximately $1,889,000.00 at time of trial, he suffered no damage by the loss of his horses. Plaintiff testified he expected to make no profit on the farm during its "formative years"; he considered it a long-term investment. Any money won by his horses was reinvested in the farm. He expected the farm to make a profit and provide him with income by the time he retired. (He was fifty-seven years old at time of trial.)
We find that a total amount of $150,000.00 will compensate plaintiff for all of his damages in this case.

COURT COSTS
Continental contends the trial court erred in failing to include as court costs the sum of $1,200.00 it paid as jury costs and in assessing costs against it when it was the prevailing party. We agree the $1,200.00 jury costs should have been included in the court costs assessed. However, in light of our decision herein, Continental is no longer the prevailing party, and thus its argument that it should not have been assessed with court costs is moot.

CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court awarding sanctions *846 to plaintiff on the pre-trial discovery motion in the sum of $4,735.43, reverse the judgment of the trial court dismissing plaintiff's suit, and render judgment on the main demand in favor of plaintiff, Jerry R. Adkins, and against Continental Grain Company, Inc., in the sum of $22,500.00, which is 15% of plaintiff's total damages of $150,000.00.[5] All costs of trial and appeal are taxed to Continental.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Burris also filed a cross-claim against Travelers for failing to defend it.
[2] Plaintiff did not complain on appeal of the assessment of 15% of the fault to Continental, and that judgment is now final.
[3] The actual stipulation states plaintiff incurred "medical" expenses, but we presume the parties meant the veterinary expenses of Dr. Stephenson.
[4] The weanlings would have been considered yearlings within two weeks after their deaths. All horses born in 1989 became yearlings on January 1, 1990.
[5] Plaintiff's settlement with Burris reduced his recovery against Continental by the percentage of Burris's proportionate fault. The monetary amount of the settlement is irrelevant. Taylor v. United States Fidelity & Guaranty Ins. Co., 630 So.2d 237, 239 (La.1993). As noted in footnote 2, supra, plaintiff failed to appeal the finding of only 15% fault of Continental, and that judgment is final.