685 So.2d 1086 (1996)
LOUISIANA FARMS a/k/a Bartmess Farms, et al. Plaintiffs-Appellees,
v.
LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES, et al. Defendants-Appellants.
No. 95-845.
Court of Appeal of Louisiana, Third Circuit.
October 9, 1996.
Rehearing Denied January 27, 1997.
*1088 Robert Ray Earle, Farmerville, for Louisiana Farms, a/k/a Bartmess Farms et al.
Kenneth LeVergene Ross, Thomas Jay Seale III, Mark E. Seamster, Russell Weeks Rudolph, Hammond, for Louisiana Department of Wildlife & Fisheries.
Before KNOLL, THIBODEAUX, COOKS, SAUNDERS and AMY, JJ.
AMY, Judge.
This appeal arises from the Louisiana Department of Wildlife & Fisheries' [DWF] constructive seizure of George Bartmess' alligator/catfish farm in Franklin Parish, Louisiana. The plaintiffs, Louisiana Farms, a/k/a Bartmess Farms, George and Helen Bartmess filed suit against DWF and three of its agents, Clinton Eubanks, Emmett Bonner, and Johnny Ferrington. The plaintiffs alleged the impropriety of the constructive seizure under the United States Constitution, 42 U.S.C. § 1983, the Louisiana Constitution, and La.Civ.Code art. 2315. The trial court found that the seizure was unreasonable and unconstitutional and assessed $4,600,000.00 in compensatory damages and $3,000,000.00 in punitive damages against DWF and its three agents. The trial court held that Agents Eubanks and Ferrington were liable in their official capacity only; whereas, Bonner was found liable in both his individual and official capacity. Additionally, all defendants were cast for attorney's fees under 42 U.S.C.1988(b). Defendants appeal from that judgment. For the following reasons, we (1) reverse the trial court's award of punitive damages and attorney's fees against DWF and its three agents; (2) reverse the trial court's finding of liability for the compensatory damage awards against Agents Eubanks, Bonner, and Ferrington; (3) reverse the $2,250,000.00 compensatory award for future lost profits on Bartmess' catfish operations; and (4) affirm the trial court's remaining compensatory damage awards of $2,350,000.00 against DWF.

DISCUSSION OF THE RECORD
In 1989, undercover agents for the United States Fish & Wildlife Service [USFWS] began to investigate potential Lacey Act, 16 U.S.C. § 3371-3378, violations arising in the transport of alligators and alligator hides from Texas to Louisiana. Vern "Skip" Stuckman informed agents that Texas hides were being skinned in accordance with Louisiana regulations and imported by an undisclosed Louisiana farmer. Stuckman disclosed characteristics about his customer that enabled federal agents to develop a profile of *1089 the suspect. This profile suggested that a north Louisiana alligator farmer who also farmed catfish and conducted operations adjacent to a fish processing plant was the culprit. The federal agents bolstered their profile by obtaining telephone records revealing calls placed to the Bartmess residence from a Texas bar frequented by Stuckman. As a result, George Bartmess became the prime suspect. The USFWS subsequently obtained two federal search warrants, one for the Bartmess residence in Winnsboro, Louisiana, and the other one for the Bartmess alligator/catfish farm near Wisner, Louisiana.
The federal agents then contacted Colonel Winston Vidrine at DWF headquarters in Baton Rouge to request assistance in executing the warrants. Colonel Vidrine agreed and assigned the following DWF agents to assist the federal agents: Emmett Bonner, Clinton Eubanks, and Johnny Ferrington. A joint task force, comprised of federal and state agents, was formed to execute both federal search warrants.
On the morning of August 10, 1991, the task force split in two. One group, led by federal agent Monroe, proceeded to the Bartmess residence in Winnsboro. DWF agents Emmett Bonner and Clinton Eubanks accompanied this group. The agents searched the Bartmess residence, but made no seizures. DWF agents Bonner and Eubanks then went to Bartmess' alligator/catfish farm. The second group proceeded to the Bartmess farm near Wisner with an intent to recover seven to nine alligator hides that were specially marked by the USFWS and sold to Skip Stuckman at an earlier date. The federal agents identified and seized two of the marked alligator hides and issued Bartmess a citation for the alleged violation of the Lacey Act.
Also, during the search, DWF agents inspected Bartmess' freezers and discovered almost 80 untagged alligator hides and nearly 100 untagged alligator carcasses, an apparent violation of DWF's "Alligator Regulations." Further, DWF agents found that Bartmess had wild deer enclosed in pens without a DWF permit. DWF agent Johnny Ferrington issued Bartmess two citations: (1) possession of alligator hides and carcasses without tags; and (2) possessing wild game quadrupeds without a license.
On the eve of their departure, DWF agents were faced with a problem: DWF was not immediately equipped to store the alligator hides and carcasses seized from Bartmess' farm. At that point, DWF agent Eubanks contacted Don Puckett, an attorney for DWF in Baton Rouge, seeking advice on how to protect the state's interests concerning the hides and other potential violations. Puckett advised Eubanks that DWF agents should constructively seize the entire Bartmess farm operation. Accordingly, DWF agents issued Bartmess a seizure order, which in effect, created a constructive seizure over his farm. Under the terms of this seizure, Bartmess could physically possess his farm, which encompassed about 7,200 alligators and several ponds of catfish; however, he could not remove anything from his farm. Specifically, the seizure order stated: "All live alligators placed under constructive seizure and nothing will be moved from these premises until notified by La. Dept. Of Wildlife & Fisheries."
On the next day, August 11, 1991, DWF agents returned to the Bartmess farm and confiscated unused alligator tags and business records related to Bartmess' alligator operations. Two days later, on August 13, 1991, DWF agents, again, went to the Bartmess farm to collect the untagged alligator hides and carcasses. These items were transported to the DWF headquarters in Baton Rouge, where they remained at the time of trial.
On August 22, 1991, Bartmess applied for a game breeders license that would have authorized him to pen wild deer on his farm. However, DWF denied this application. Bartmess also had a substantial catfish farm in Catahoula Parish, Louisiana. Bartmess did not own the land on which he conducted this catfish farm; he leased this land from B.E. Quinn & Sons. DWF asserts that this farm was never under the constructive seizure. On the other hand, Bartmess insisted that he believed that his Catahoula farm was also seized. On September 10, 1991, Bartmess made a formal written demand upon DWF to lift its constructive seizure on his *1090 farm operations. By a letter dated September 19, 1991, DWF informed Bartmess that the seizure did not affect his catfish operations, but that his alligator farming permit was suspended pending the completion of the federal and state investigations. Bartmess then applied for a permit reauthorizing[1] his farm in Wisner to receive alligator hatchlings. But, DWF denied his application. By a letter dated October 9, 1991, DWF informed Bartmess that his alligator license had been revoked.[2]
Both DWF citations that were issued to Bartmess on August 10, 1991 were originally set for a hearing on September 25, 1991 in the Fifth Judicial District Court of Franklin Parish. However, all DWF proceedings were held in abeyance pending the conclusion of the USFWS proceedings. Bartmess was eventually acquitted of the federal charges on September 17, 1992 after a jury trial in the United States District Court for the Eastern District of Texas, Beaumont Division. However, the state failed to prosecute Bartmess under the two citations that DWF agents had issued to him, and the time limit for prosecution had expired.
As a result of the constructive seizure, Bartmess could not remove anything from his alligator/catfish farm in Wisner. Prior to the DWF seizure, Bartmess had exchanged catfish for feed with his supplier, Wisner Minnow Hatchery, Inc. But, DWF's seizure order temporarily put an end to this arrangement because Bartmess could not remove catfish from his ponds and deliver them to his supplier in exchange for feed for his farming operations. Bartmess' catfish began to lose weight. The record substantiates that Bartmess' catfish lost a total of 250,000 pounds and that such a loss should be valued at forty-six cents per pound, resulting in a $115,000.00 loss to Bartmess.
Additionally, Bartmess began to experience problems with his alligator herd. Because Bartmess could not remove anything from his farm, the alligators' growth exceeded the space allotted to them in their heated, controlled environment. The alligators began to fight among themselves, which increased their stress level. Finally, diseases began to develop in the alligators which resulted in a deterioration of their skin quality.
Because of the seizure, Bartmess began to suffer extreme financial problems. As a result, in April 1992, Bartmess was given permission by DWF to liquidate his 7,200 alligator herd. DWF also agreed to lift its constructive seizure once the sale of his alligators was final. In June 1992, Bartmess sold his herd for $300,000.00 to Robert Ferrington. The record substantiates that a reasonable value of Bartmess' alligator herd, at the time of sale, was $520,000.00. However, despite this sale, Bartmess' financial condition steadily declined and, in August 1993, Bartmess filed for bankruptcy.
On November 8, 1991, Bartmess and his wife, Helen, filed suit against DWF, and three of its agents, Clinton Eubanks, Johnny Ferrington, and Emmett Bonner in their official and private capacities. The plaintiffs alleged that they suffered extensive economic losses because the defendants had wrongfully seized their property without due process of law. The plaintiffs alleged that the defendants violated:
(1) The 5th and 14th Amendments to the United States Constitution and Article I, § 1 & 4 of the Louisiana Constitution by wrongfully seizing Bartmess' farming operations in violation of the plaintiffs' due process rights;
(2) The 4th Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution by conducting an unreasonable seizure;
(3) 42 U.S.C. § 1983, 1985, and 1986 by conspiring to deprive plaintiffs of their constitutional rights under the color of state law; and,
(4) La.Civ.Code art. 2315 by negligently harming plaintiffs.
*1091 After a trial on the merits, the trial court found that the constructive seizure was unreasonable and unconstitutional. The trial court stated in part:
By not proceeding with the criminal prosecution against Mr. Bartmess, the Department of Wildlife and Fisheries has circumvented the law and denied Bartmess due process in the seizure of his property, State v. Spooner, 520 So.2d 336 (La.1988). The validity of the search under the federal search warrant is irrelevant. Under that warrant, federal agents were seeking seven to nine marked alligator hides. Out of this lawful search, two alligator hides were seized. The federal authorities proceeded with the prosecution of Mr. Bartmess. Bartmess prevailed in this prosecution and was found innocent. However, while accompanying federal agents in this lawful endeavor, state agents engaged in an unprecedented and pervasive seizure of plaintiff's property. In effect, seizing everything the plaintiff owned. There is no basis in state law for such a confiscation. The search and accompanying seizure were warrantless and outside the authority granted to D.W.F. agents under the provisions of title 56. The fact that the D.W.F. has failed to prosecute the alleged violations of Mr. Bartmess is unconscionable and a clear denial of his constitutional rights. The D.W.F. acknowledged its wrong doing by the letter of September 1991 where the plaintiff's catfish operation was released from the constructive seizure.
The trial court then awarded the following compensatory damages to the plaintiffs: (1) $115,000.00 for the weight loss of the catfish; (2) $220,000.00 for Bartmess' loss when he was forced to liquidate his alligator herd at a reduced price; (3) $1,945,000.00 in lost profits on the alligator farm for a 9.5 year period; (4) $2,250,000.00 in lost profits on his catfish farm operations, including his fish operations in Catahoula Parish, for a 9.5 year period; and (5) $35,000.00 each to the plaintiffs for their mental anguish and suffering. Further, the trial court awarded the plaintiffs $3,000,000.00 in punitive damages under 42 U.S.C. § 1983. The plaintiffs were also awarded attorney's fees under § 1983, et seq. Therefore, the trial court awarded the plaintiffs $4,600,000.00 in compensatory damages and $3,000,000.00 in punitive damages, together with legal interest from the date of judicial demand and assessed all costs of the proceeding against the defendants. Finally, the trial court rendered this judgment against the State of Louisiana, through DWF, Clinton Eubanks and Johnny Ferrington, in their official capacity as enforcement agents for DWF, and Emmett Bonner, individually and in his official capacity as an enforcement agent for DWF.
Defendants appeal from that judgment and assign twenty-four assignments of error. However, defendants request that we adjudge seven issues upon review, namely:
(1) Whether the DWF or its agents, in their official capacities, are considered statutory "persons" under 42 U.S.C. § 1983 and are, therefore, amenable to awards of punitive damages and attorney's fees;
(2) Whether Bartmess' punitive damages demand, made via post-trial amended and supplemental petition, comports with Louisiana's procedural laws and the procedural due process requirements of the United States Constitution;
(3) Whether the trial court's award of punitive damages against the DWF and its agents is manifestly erroneous;
(4) Whether the DWF agents are entitled to qualified immunity under state law and/or federal law;
(5) Whether the trial court's compensatory damages award is manifestly erroneous;
(6) Whether the plaintiffs are entitled to an award of attorney's fees under 42 U.S.C. § 1988(b); and,
(7) Whether interest on the trial court's awards of attorney's fees and costs, future lost profits, and punitive damages should accrue from the date of judicial demand or the date of judgment.
Plaintiffs answered the defendants' appeal and request that we (1) assess trial and appellate costs to the state and (2) increase *1092 the trial court's punitive and compensatory damage awards.

LAW

THE 1983 ACTION
The trial court determined that the State of Louisiana and its agents are statutory "persons" under 42 U.S.C. § 1983 because Louisiana consents to disregard its sovereign immunity in delictual actions via La. Const. art. XII, § 10. The trial court specifically stated:
La. Const. Art. 12, Sec. 10 eliminates sovereign immunity as to all torts. Since deprivation of protected rights under 42 USC § 1983 is a tort claim, it is the holding of this Court that La. Const. Art. 12, Sec. 10 is a waiver by the State of Louisiana of the 11th Amendment[3] immunity as far as 42 USC § 1983 actions are concerned.
Defendants argue that neither states nor its agents, in their official capacities, are statutory "persons" pursuant to 42 U.S.C. § 1983 and, therefore, are not liable for punitive damages and attorney's fees under § 1983 et. seq. We agree.
42 U.S.C. § 1983, the federal statute which grants a civil remedy to citizens whose constitutional rights have been deprived, states:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
The United States Supreme Court has held that neither a state nor its officials acting in their official capacity are "persons" within the meaning of § 1983. These cases involved the statutory interpretation of § 1983. Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); Howlett By and Through Howlett v. Rose, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); Will v. Michigan Dept. Of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). In Will, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45, petitioner, Ray Will, filed Michigan statecourt suits under 42 U.S.C. § 1983 alleging that the respondents, the Department of State Police and the Director of the State Police, in his official capacity, had denied him a promotion for improper reasons. The United States Supreme Court specifically considered whether a state or a state official, in his official capacity, could be sued under § 1983. The Supreme Court concluded:
We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.
Will, 491 U.S. at 71, 109 S.Ct. at 2312.
In Howlett, 496 U.S. 356, 376, 110 S.Ct. 2430, 2442-2443, 110 L.Ed.2d 332, the United States Supreme Court stated:
A State may not, by statute or common law, create a cause of action under § 1983 against an entity whom Congress has not subjected to liability. Since this Court has construed the word "person" in § 1983 to exclude States, neither a federal court nor a state court may entertain a § 1983 action against such a defendant. [Citations omitted.]
Further, in LaBauve v. State, 618 So.2d 1187 (La.App. 3 Cir.), writ denied, 624 So.2d 1235 (La.1993), plaintiff, Harold LaBauve, filed a police brutality suit against the State of Louisiana, through the Department of Public Safety and Corrections (State Police), and its employee, State Trooper Dennis Pellerin. LaBauve, who was 76 years old, *1093 alleged that Trooper Pellerin used excessive force in arresting him by putting him on rocks and gravel to handcuff him, which resulted in bruises, cuts, and abrasions on his face and knees. LaBauve filed suit under La.Civ.Code art. 2315 and § 1983. The trial court found that Trooper Pellerin was negligent and awarded LaBauve $12,000.00 in general damages and $3,500.00 in medical expenses. The trial court also held that since Trooper Pellerin was in the course and scope of his employment, the State Police was liable for the money judgment. Defendants appealed, and in one of their assignments of error, alleged that the trial court erred in denying the State Police's exception for dismissal on the § 1983 action. We held that the trial court erred in denying the motion in limine requesting dismissal of the State Police from LaBauve's federal law claim because we noted that a state is not a person under § 1983. We cited Will, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 in support of our conclusion. However, we noted that the trial court's error was harmless because it did not award LaBauve any damages under his federal law claim.
Other appellate courts in Louisiana have held that neither a state nor its agents, acting in their official capacities, are "persons" under § 1983. For example, in Latullas v. State, 94-2049 (La.App. 1 Cir. 6/23/95); 658 So.2d 800, plaintiff, Vanessa Latullas, a former inmate at the Louisiana Correctional Institute for Women at St. Gabriel, was raped by a prison security officer during her incarceration and became pregnant. Latullas subsequently filed a suit against the state, the prison warden, and the prison security officer, seeking damages. The trial court granted judgment against the prison security officer, in his individual capacity, under 42 U.S.C. § 1983 and La.Civ.Code art. 2315 in the amount of $150,000.00 in general damages and $35,000.00 in attorney's fees. Latullas appealed and asserted that the trial court erred in failing to hold the state and the prison warden liable under § 1983. However, the first circuit, in affirming the trial court's judgment on that issue, held that neither the state nor the prison warden, acting in his official capacity, was a "person" under § 1983. See also Board of Examiners v. Neyrey, 542 So.2d 56 (La.App. 4 Cir.), writ denied, 548 So.2d 1231 (La.1989).
Therefore, we conclude that the trial court erred in finding that DWF and its agents, in their official capacities, were "persons" under § 1983. Thus, DWF and its agents, in their official capacities, are not liable for punitive damages nor attorney's fees. However, there remains the question of whether, under § 1983, the DWF agents were liable in their individual capacities. Accordingly, we turn to the relevant inquiry of whether DWF agents, Bonner, Eubanks, and Ferrington, are entitled to the defenses of "qualified" immunity and "good faith" immunity under § 1983 and La.R.S. 56:65, respectively.

QUALIFIED IMMUNITY AND GOOD FAITH IMMUNITY
The affirmative defense of qualified immunity from suit is available to all governmental officials in § 1983 actions. Taylor v. City of Shreveport, 26,280 (La.App. 2 Cir. 4/7/95); 653 So.2d 232, writ denied, 95-1131 (La.6/16/95); 655 So.2d 333. The governmental official has the burden of proving the defense of qualified immunity. Id. A governmental official is shielded from liability for civil damages under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Moresi v. Dept. Of Wildlife & Fisheries, 567 So.2d 1081 (La.1990), citing Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). See also Behrens v. Pelletier, ___ U.S. ___, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Buckley v. Fitzsimmons, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Christian v. Fontenot, 28,175 (La. App. 2 Cir. 4/8/96); 672 So.2d 436; Amato v. Office of Com'r of Securities, 94-0082 (La. App. 4 Cir. 10/3/94); 644 So.2d 412, writ denied, 94-3024 (La.2/3/95); 649 So.2d 410.
In Anderson v. Creighton, 483 U.S. 635, 638-640, 107 S.Ct. 3034, 3038-3039, 97 L.Ed.2d 523 (1987), the United States Supreme Court explained the concept of qualified immunity:
*1094 When governmental officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." Harlow v. Fitzgerald, 457 U.S., at 814, 102 S.Ct., at 2736. On the other hand, permitting damages suits against governmental officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Ibid. Our cases have accommodated these conflicting concerns by generally providing governmental officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. See, e.g., Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); id., at 344-345, 106 S.Ct., at 1097-1098 (police officers applying for warrants are immune if a reasonable officer could have believed that there was probable cause to support the application); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984); id., at 198, 104 S.Ct., at 3021 (BRENNAN, J., concurring in part and dissenting and part); Harlow v. Fitzgerald, supra, 457 U.S., at 819, 102 S.Ct., at 2738. Cf., e.g., Procunier v. Navarette, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action. Harlow, 457 U.S., at 819, 102 S.Ct., at 2739, assessed in the light of the legal rules that were "clearly established" at the time it was taken, id., at 818, 102 S.Ct., at 2738.
* * * * * *
It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must be "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, see Mitchell, supra, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. See, e.g., Malley, supra, 475 U.S., at 344-345, 106 S.Ct., at 1097-1098; Mitchell, supra, 472 U.S., at 528, 105 S.Ct., at 2816; Davis, supra, 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019.
The following evidence was introduced at trial.
Emmett Bonner testified that he was a Lieutenant with DWF and had been employed as a wildlife enforcement agent for approximately 16 years. Bonner stated that he supervised DWF agents in four parishes: Concordia, Catahoula, LaSalle, and Caldwell. Bonner testified that he was contacted on August 9, 1991, at about 10:00 p.m., by Bill Ferguson, a USFWS agent, who wanted him to assist federal agents with a search warrant of an alligator farm in Franklin Parish, Louisiana. Bonner further stated that he then contacted Lieutenant Clinton Eubanks because Franklin Parish was in Eubanks' supervision. He noted that the next morning, August 10, he met the federal agents at a Dairy Queen in Jonesville, Louisiana and learned that the subject of the search warrant was George Bartmess. He further testified that he saw the federal search warrant while meeting the federal agents.
Bonner testified that he accompanied the federal agents to the Bartmess residence. After the search warrant was executed at the residence, Bonner stated that he and federal agent, Johnny Collins, proceeded to travel to Bartmess' alligator/catfish farm. He further stated that DWF "wasn't concerned with anything" except for assisting the federal agents in looking for the marked alligator *1095 hides. In fact, he testified that, prior to the search, there was never any type of discussion at DWF that Bartmess was not tagging his alligators properly.
Bonner testified that once he arrived at Bartmess' farm, he began to assist the federal agents looking through several alligator skins to find the special marks. He stated that he would unroll the alligator skin, look at the last few inches of the tail to ascertain if there was a mark, and, if not, he would resalt the alligator skin, re-roll it, and then place the skin back into the "walk-in freezer." He testified that "agents there told me they had located a large amount of untagged skins in a freezer, chest type freezer." He further noted that these untagged skins were located in the same vicinity as where the federal agents had been executing their search warrant.
Bonner testified that once the alligator hide was separated from the carcass, the farmer had to put a tag on the skin. However, he admitted that he had never issued a citation for an alleged violation of that regulation. But, he unequivocally testified that he did not question the legality of the citation that was issued to Bartmess for possessing alligator skins without a tag. In fact, Bonner stated that he believed that Bartmess had violated the alligator regulations[4] by having alligator skins with no state tags. Bonner also testified that the seizure affected "only" Bartmess' "alligator operation." He then stated that he went back to Bartmess' farm on August 13, 1991 to assist biologists from DWF to load up the alligator hides that had no state tags and transport them to Baton Rouge. However, after August 13, Bonner noted that he had no involvement with the case. In fact, Bonner testified that DWF headquarters in Baton Rouge would be responsible for the administrative dealings regarding the revocation and/or suspension of Bartmess' alligator license.
Clinton Eubanks testified that, on August 10, 1991, he was a Lieutenant Supervisor with DWF and that he supervised DWF agents in Franklin, Tensas, and Madison Parishes. Eubanks stated that he was employed by DWF for about 21 years as a wildlife enforcement agent. However, he noted that he retired from DWF in July 1992.
Eubanks testified that Bonner called him on August 9, 1991 and asked him to meet with the federal agents to assist in serving a search warrant the next morning. He stated that the next morning, at the Dairy Queen in Jonesville, he found out that the federal agents were going to Franklin Parish to execute a federal search warrant at the Bartmess residence and farm. He further stated that federal agents informed him that they were going to "look for marked alligator skins that had been ... illegal alligator skins that had been purchased from an illegal dealer." Eubanks then testified that, prior to the federal search warrant for the Bartmess residence and farm, he had never received any information from DWF headquarters in Baton Rouge regarding any type of possible violation that Bartmess may have committed.
Eubanks testified that he accompanied Bonner and three federal agents to the Bartmess residence in Winnsboro. He also stated that he saw the federal search warrant when a federal agent handed it to Mrs. Bartmess at the residence. He testified that the agents completed the execution of the search warrant at the Bartmess residence at approximately 11:00 a.m. At that point, Eubanks *1096 continued, he went to Bartmess' farm. Eubanks stated that when he arrived at Bartmess' farm, the federal agents had located two alligator hides that had been marked by USFWS. When Eubanks was asked about the DWF citation issued to Bartmess for possessing alligator skins without state tags, the following colloquy took place:
Q. Okay. Did you have occasion to make any phone calls to the legal section in Baton Rouge prior to the federal agents leaving?
A. No sir. I didn't make a phone call. The federal agent had called Baton Rouge, Frank Simms. Frank Simms had called down there, and he come out and told me that Don Puckett, our department lawyer, wanted to talk to me. And I went in to talk to him.
Q. Okay. Did Mr. Puckett give you any instructions as to what you needed to do regarding this operation?
A. Yes sir.
Q. What was that?
A. I told him what we had found. We had found at that time approximately seventy untagged skins, and during this operation, we had also found several deer in a pen and we had asked Mr. Bartmess if he had a permit for raising deer, which he didn't have. And, after I explained this to him, he told me to go ahead and charge Mr. Bartmess with the possession of the untagged skins and the possession of wild game, quadrupeds, without a permit.
Q. Okay. Prior to going there, when you met in Jonesville with the federal agents, did you or Mr. Bonner or any other state agents decidewell, we're going there to write Mr. Bartmess up for having untagged alligator hides or we're going to write him up for having deer without permits?
A. No sir, that wasn't discussed with me.
Q. Okay. Prior to this incident, Mr. Eubanks, had you ever had occasion to write up any other alligator farmer for having untagged alligator hides?
A. No sir, not to my knowledge.
* * * * * *
Q. Okay. Who instructed you to put a constructive seizure on Mr. Bartmess' farm?
A. It was originally brought up by Frank Simms. After they had finished their.... their search of the premises, he advised me to put a constructive seizure order on the place. And, I asked him if that meant the entire farm because I knew he was involved in catfish farming there, also. And Frank Simms said he would ... he would put it on the entire farm.
Q. Okay.
A. But the decision was made by Mr. Puckett, Don Puckett, our department lawyer because that ... when I went in and talked to him on the phone, and advised him of what we had, I also advised him of what Mr. Simms had said about the order. He advised me to go ahead and place the seizure order on the farm. The entire farm there.
* * * * * *
Q. And you were instructed by Mr. Puckett, who was in the legal section at Wild Life [sic] & Fisheries, to include the entire farm?
A. Yes sir. After I ... could I ...
Q. Yes sir.
A. Okay. After we came onto the farm, it was hard to tell what ponds he had alligators in and what ponds he didn't because there were alligators everywhere there. So we didn't know. And I explained that to Mr. Puckett. He saidgo ahead and put it on the entire farm then.
* * * * * *
Q. If you know, Mr. Eubanks, why was the seizure order written in this case?
A. The seizure order was written because of the amount of untagged skins on the premises and the alligators, and we had no place to keep all that, had we outright seized it. So we placed the constructive seizure on the place *1097 to prevent him from moving anything. Any of the alligators, alligator parts, until further disposition from the Department of Wild Life [sic] & Fisheries.
Eubanks admitted that he had never issued a citation to an alligator farmer for possessing alligator hides without a state tag. However, Eubanks specifically testified that he knew that the alligator regulations provided that once the hide had been removed from the carcass, the alligator farmer had to place a state tag on the tail. Further, he stated that he had a good faith belief that Bartmess' possession of the untagged alligator skins was a violation of the "Alligator Regulations." Also, Eubanks stated that the untagged alligator skins that DWF agents located were in the same vicinity as the two USFWS marked alligator skins that federal agents located at Bartmess' farm.
Eubanks testified that the day after the constructive seizure, August 11, he went back to Bartmess' farm to collect all of Bartmess' unused alligator tags and records that Bartmess kept on his farm raised alligators. He also testified that, on the same day, he advised Bartmess that the catfish operations were not affected by the constructive seizure.[5] Eubanks stated that he went back to Bartmess' farm, again, on August 13 to assist DWF agents in retrieving all the untagged alligator skins. Eubanks noted that the next time he visited Bartmess' farm was on September 19, 1991 to deliver a letter from DWF informing Bartmess that his catfish farming was not part of the seizure order. Finally, he stated that after he delivered that letter to Bartmess he had no more involvement in the case.
William Ferguson, a special agent with USFWS who was at Bartmess' alligator/catfish farm on August 10, corroborated Eubanks' testimony regarding the telephone call to DWF headquarters in Baton Rouge. Ferguson testified that, while the agents searched for the USFWS marked alligator hides, the agents had looked into a "big freezer" and that the freezer was "full" of frozen alligator skins with no state tags. He admitted that, at that point, he was "not sure" if there was a violation of the state alligator regulations. He further testified that he began to make some telephone calls to ascertain whether there was a state violation. He stated that several people were phoned, namely: Kell McInnis, the acting Secretary of DWF, Don Puckett, an attorney with DWF, and alligator biologists at the Rockefeller Refuge.
Johnny Ferrington testified that he was employed by DWF as a wildlife enforcement agent. He noted that he had been with DWF for "[t]wenty something years." He stated that, on the morning of August 10, 1991, he responded to a call to assist USFWS agents in executing a federal search warrant at Bartmess' farm in Franklin Parish. He also testified that he had not been part of any of the prior planning; he was responding to a call to assist the federal agents at Bartmess' farm. Ferrington stated that he arrived at Bartmess' farm somewhere between 8:30 and 9:30 a.m. He testified that the federal agents informed him that they were looking for alligator hides with "some markings." At that point, Ferrington stated, he "rolled up" his sleeves and began to assist the federal agents in retrieving alligator hides from a freezer and inspecting them for the special marks.
Ferrington testified that he issued Bartmess two citations: (1) possessing alligator skins without a state tag and (2) possessing wild deer without a permit. He also stated that prior to these citations being written, Eubanks had been in contact with DWF headquarters in Baton Rouge to ascertain what charges to bring against Bartmess. He testified that it was not up to him to decide whether Bartmess had violated the "Alligator Regulations" by possessing the untagged skins that the agents located. He noted that, while he had some reservations about the alleged violations, he was required to follow Eubanks' instructions because he was the high ranking DWF agent at Bartmess' farm.
Ferrington testified that on August 11, 1991, he returned to Bartmess' farm with *1098 Eubanks to pick up all of Bartmess' unused alligator tags and records. He further testified that he went to Bartmess' farm two days later to assist DWF agents in collecting the untagged alligator hides and transport them to Baton Rouge. Finally, Ferrington stated that he had no involvement with the Bartmess case after August 13, 1991.
After reviewing the record, we conclude that DWF agents Eubanks, Bonner, and Ferrington are entitled to the defense of qualified immunity under § 1983 because (1) Colonel Winston Vidrine had instructed these agents to assist federal agents who had a search warrant for Bartmess' residence and alligator/catfish farm; (2) there is absolutely nothing in the record to indicate that the federal search warrant was illegal; (3) while assisting the federal agents in their search, DWF agents saw, in plain view[6], several alligator hides and carcasses without tags, an apparent violation of the "Alligator Regulations"; (4) DWF agents also found several alligator hides that were frozen, thus, they could not determine whether those hides were tagged; (5) Eubanks and Bonner believed that there were several violations (alligator hides without tags); (6) Ferrington had some reservations about the alleged violations, however, he was required to follow the chain of command (Eubanks was the highest DWF agent during the search); (7) Eubanks was faced with a pressing problem: it was getting late and DWF had no facilities to immediately store the evidence; (8) Eubanks issued a constructive seizure only after talking to Don Puckett, an attorney with DWF in Baton Rouge, who advised him to constructively seize the farm; (9) Rule H(1) of the "Alligator Regulations" specifically allowed DWF agents to confiscate both alligator hides and tags; (10) all three DWF agents were only involved in retrieving the evidence from the Bartmess farm the following three days after the constructive seizure; (11) DWF agents Bonner and Ferrington had no involvement in this affair after August 13, 1991; and (12) the only subsequent involvement Eubanks had was when he delivered a letter from DWF dated September 19, 1991 to Bartmess which advised him that the constructive seizure did not affect his catfish operation.
The record substantiates that this was the first time that these DWF agents had issued a citation to an alligator farmer for possessing alligator hides without tags. Further, the record reveals that the alligator regulations were not "clearly established" regarding the specific point in time during the process when an alligator was considered "skinned" and, therefore, needed a state tag to be placed on the tail. DWF agents Eubanks and Bonner believed that, while some of Bartmess' alligator hides still had flesh on them, that the alligator hides needed to be tagged since the hides had been removed from the alligators' carcasses. However, Ted Joanen[7] testified that he was responsible for the "Alligator Regulations," which included F(7) at issue in the present case. Joanen stated that the "skinning" of an alligator is broken down into several stages:

*1099 You kill the animals, then the first part of the skinning or the first stage of the skinning process is the take off. You remove the skin from the animal. Then you scrape it, flesh it, wash it, salt it, remove that salt, and re-salt it, then we allow tagging.
But, Joanen admitted that F(7) only states that the alligator farmer has to put a tag when the alligators are "skinned." He further acknowledged that F(7) does not specifically enunciate the several steps involved in the skinning process. However, he noted that these steps are published in technical publications regarding alligator farming. The "Alligator Regulations" were not clear as to when an alligator farmer was required to put a tag on an alligator hide removed from the carcass during the skinning process.
Therefore, we conclude that DWF agents Eubanks, Bonner, and Ferrington, in their private capacities, are entitled to qualified immunity for damages resulting from the constructive seizure placed on Bartmess' alligator/catfish farm. We find that, in light of the legal rules established at the time of the constructive seizure, DWF's agents' actions were reasonable. Further, we do not conclude that DWF's agents knowingly violated any "clearly established" legal rule[8] at the time of the constructive seizure (August 10, 1991) and the two days that followed when agents returned to the Bartmess farm to collect the evidence (August 11 and 13, 1991)[9]. Thus, the plaintiffs do not have a § 1983 claim against the defendants. Accordingly, the plaintiffs are not entitled to punitive damages and attorney's fees. Because of our disposition on this issue, other arguments regarding § 1983 claims are now moot.
Additionally, we find that DWF agents Eubanks, Bonner, and Ferrington are entitled to the good faith immunity defense for any tort claim as set forth in La.R.S. 56:65(A), which provides in part that:
Neither the department nor any enforcing officer, agent, or other employee of the department shall incur any liability whatsoever for any search, arrest, seizure, or other act done by him in the good faith performance of his duties under this Chapter.
There is an initial inquiry of whether the good faith immunity and qualified immunity defenses trigger the same or different standards. We conclude that "good faith" immunity and "qualified" immunity each triggers the standard that we previously discussed. See Harlow, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396; Moresi, 567 So.2d 1081. Accordingly, we merge our review of defendants' good faith immunity arguments, with regard to the state tort claim, with the foregoing qualified immunity analysis. Therefore, we conclude that DWF agents Eubanks, Bonner, and Ferrington are not liable in *1100 their individual capacities for any tort claim under La.Civ.Code art. 2315.

LOUISIANA TORT CLAIM
In the present case, the trial court found that DWF's seizure was unreasonable and unconstitutional.
La. Const. art. 12, § 10 provides in part that:
(A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
(B) Waiver in Other Suits. The legislature may authorize other suits against the state, a state agency, or a political subdivision. A measure authorizing suit shall waive immunity from suit and liability.
Under the foregoing article, Louisiana has waived its sovereign immunity from liability in contract and tort claims. See generally Chamberlain v. State Through DOTD, 624 So.2d 874 (La.1993); Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990); Darville v. Associated Indemnity Corporation, 323 So.2d 441 (La.1975).
La. Const. art. I, § 5 provides in part that: Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.... Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
In Moresi, 567 So.2d at 1092-1093, the Louisiana Supreme Court, in discussing whether a person adversely affected by an unreasonable search or seizure could obtain damages under La.Civ.Code art. 2315[10], stated:
Considering the expression of the framers in the textual formula of Article I, § 5, the history of the provision as recorded in the convention proceedings, and the strong resemblance between our state guaranty and that of the Fourth Amendment and its English constitutional law antecedents, we conclude that damages may be obtained by an individual for injuries or loss caused by a violation of Article I, § 5 of the 1974 Louisiana Constitution. Historically, damages have been regarded as the appropriate remedy for an invasion of a person's interest in liberty or property. La.C.C. art. 2315 (1870); Sweeten v. Friedman, 9 La.App. 44, 118 So. 787 (1928) (false imprisonment); Cormier v. Blake, 198 So.2d 139 (La.App. 3d Cir.1967) (malicious prosecution); Dauphine v. Herbert, 37 So.2d 829 (La.App.Orl.1948) (malicious prosecution); see F. Stone, Tort Doctrine § 200 et seq., in 12 La.Civil Law Treatise (1977); Hayes v. Dompe, 331 So.2d 874 (La.App. 2d Cir. 1976) (trespass and invasion of privacy); Layne La. Co. v. Superior Oil Co., 209 La. 1014, 26 So.2d 20 (1946) (trespass); Stone, supra at § 212 et seq.
The following evidence was introduced at trial pertaining to this issue.
Winston Vidrine, who was the Chief of Law Enforcement for DWF, testified that the seizure order that was issued to Bartmess by DWF agent Eubanks was primarily used for shrimp boats, oysters, and any other commercial property that the DWF would seize. Vidrine admitted that some of the language on the seizure order issued to Bartmess had been scratched out by DWF agents. When Vidrine was asked whether the seizure order and citation that was issued to Bartmess should have informed him that he had the right to request an administrative hearing, the following colloquy took place:
Q. Let me ask you this. If ... if Mr. John Doe has a shrimp boat in the Gulf of Mexico off Chalmette, wherever, and he's in violation of some shrimping regulation, and Mr. John Doe's boat is seized with a document just like this, (the seizure order given to Bartmess) does Mr. John Doe have a right to go and have a hearing some place and give his side of it or does he just lose his vote? Or do you know?
A. No, he has a right to have a hearing date.

*1101 Q. Exactly. And I think that's the part that's scratched out, it appears to me.
A. Probably so.
Q. Is there a date up there where it has a place for a date? Is there a date filled in there?
A. No sir.
* * * * * *
Q.... whatever is took and you are to appear on ... instructed to appear at... what does it say?
A. Right. It says, "will be notified."
Q. Oh, okay. Do you know whether Mr. Bartmess was ever notified?
A. I don't know if he was or not, sir.
* * * * * *
Q. Okay. So there at least would be a hearing, even under the regulations there, wouldn't it, Colonel? They'd have to appear ...
A. But it says here a citation was issued now.
Q. Yes sir. But they are suspended pending ...
A. For violations of the rules and regulations.
Q. The last part, what you just read, read it again. Okay, appeared before whom?
A. "Before the Department."
Q. Okay. Now, we can assume that that would be some type of hearing?
A. Correct.
Q. Okay. So even under the regulations, there would be a hearing, wouldn't it?
A. You can have one, yes.
Q. Well, give me a situation where there would not be a hearing, other than Mr. Bartmess' case.
A. I don't know right off.
Kell McInnis testified that he was the acting Secretary of DWF in August 1991. McInnis stated that, as the acting Secretary, he was responsible for the overall operation of DWF. When McInnis was asked what effect a citation for possessing untagged alligator hides would have on Bartmess, the following colloquy took place:
Q. Let me show you a section of the 1991 Alligator Regulations, which I believe are Plaintiff's Exhibit # 9. And I'll direct you to Section Q2, if you would read the first sentence from Q2 for me.
A. "If citations are issued for violation of these regulations, all licenses and tags belonging to or in the possession of the cited party shall be suspended until such time as the party ... as the said party appears before the Department officials for purposes of reviewing the citations issued."
Q. Is that basically your understanding of the license suspension issue that we talked about just a minute ago?
A. That's correct. As I recall, the Administrative Procedures Act sets forth that parties who have had such a suspension or revocation have an opportunity to come to the Department and indicate, you know, their side of the story if they feel that it's appropriate for them to do so.
McInnis testified that, on October 9, 1991, when DWF revoked Bartmess' alligator license, DWF informed him that he had the right to an administrative hearing to appeal the revocation.[11] After McInnis read Q(2)[12] *1102 of the "Alligator Regulations" the following exchange took place:
Q. Now, down below, the next paragraph, it says, "You have the right to appeal this decision by requesting an administrative hearing within thirty days of receipt of his letter. Such a hearing, if requested, will be held in our Baton Rouge office at a time convenient to both parties." Let me ask you this. This letter mentions that he has a right to appeal. I assume is [sic] the revocation of the license?
A. Yeah. I'm looking at this at this point, and wondering whether it was a revocation or should have been a suspension thing. Effectively, what they do is they take the license or prevent the license from being used to buy or sell alligators and if there are tags, they will pick up the tags that are in possession. And the tags must be used if you're going to ship an alligator. So that in effect....
Q. Would effectively prevented him from shipping alligators after the suspension or revocation took place.
A. Right ... right. Uh huh.
* * * * * *
Q. And I think on the letter that you did sign on October 9th to Mr. Bartmess, that your opinion was that that should have been a suspension instead of a revocation.
A. In ... as I read it right now, in looking at the regulations that was pointed out, it ... it might better have been a suspension instead of the terminology revocation. The effect of it wasis to keep the utilization of license from taking place until a hearing had taken place. Until a hearing took place, to allow for it to be used again.
Considering all of the evidence in this case, we find that the trial court was not clearly wrong in its determination that DWF is liable to the plaintiffs under La.Civ.Code art. 2315 for an unreasonable seizure of Bartmess' farm in Franklin Parish. First, we note that the first three days of the constructive seizure of Bartmess' alligator/catfish farm were reasonable because DWF agents needed some time to collect the evidence which they believed integral to violations of the "Alligator Regulations." The record substantiates that on August 11 and 13, 1991, DWF agents collected all the evidence at Bartmess' farm. The DWF agents then transported approximately 180 untagged alligator carcasses and hides to Baton Rouge. If DWF intended to proceed against Bartmess, they had apparently obtained all the evidence that they needed to establish a potential violation of the regulations. The record does not support a need, in any sense, to continue the constructive seizure of Bartmess' alligator farm, which included about 7,200 alligators, after August 13, 1991.[13] However, DWF continued its constructive seizure until April 7, 1992, when it allowed Bartmess, who was facing severe financial problems because of the seizure, to liquidate his alligator herd.
During this time, DWF did not take any action to prosecute the two citations that its agents had issued Bartmess or otherwise resolve this matter with some type of administrative hearing. In fact, by letter dated September 19, 1991, DWF notified Bartmess that his alligator permits were under "suspension pending completion of our investigation and the investigation of the U.S. Fish *1103 and Wildlife Service" and that he could not "buy, sell, trade or otherwise deal or dispose of any alligator or alligator parts." But, DWF did not inform Bartmess that he could request an administrative hearing with DWF to determine whether: (1) his alligator permits would be suspended during the investigation or (2) DWF would allow him to continue alligator farming until the completion of the investigation and hearing on the two citations. This was mandated by the "Alligator Regulations" which were introduced into evidence. The next month, when DWF revoked Bartmess' alligator permits, DWF informed him that he could request an administrative hearing to appeal.
Under the facts of this case, we find that DWF was initially cloaked with good faith immunity following the constructive seizure of Bartmess' alligator farm. At this point, we note that the state and its agencies do require some reasonable period of time to handle and process administrative matters. However, DWF's good faith immunity protection in this case began to dissipate as time progressed and DWF insisted on maintaining a constructive seizure on Bartmess' entire alligator operation without any apparent reason. Further, Bartmess, by a letter dated September 10, 1991[14], formally demanded that DWF lift its constructive seizure on his farm in Franklin Parish. When DWF refused to lift its constructive seizure on his alligator operation, Bartmess was forced to file suit in November 1991 to obtain relief. However, DWF maintained this constructive seizure on Bartmess' alligator farm for approximately nine months (April 1991 to July 1992). In the present case, we conclude that, given the pervasiveness and duration of the constructive seizure on Bartmess' farm, and DWF's failure to inform Bartmess that he had the right to request an administrative hearing when his alligator permits were suspended, the plaintiffs have clearly been affected by a seizure which became unreasonable and are entitled to damages, payable by DWF, under La.Civ.Code art. 2315. Accordingly, we conclude that the trial court did not err in finding DWF's seizure unreasonable.

DAMAGES

I. CATFISH WEIGHT LOSS AND ALLIGATOR LIQUIDATION
The trial court is afforded much discretion in granting damage awards, and this extends to special damages. Sinor v. National Casualty Company, 633 So.2d 720 (La.App. 1 Cir. 1993). The trial court has great discretion in assessing damages, and the trial court's finding in this regard will not be disturbed on appeal in the absence of clear abuse of discretion. La.Civ.Code art. 2324.1; 1900 Partnership v. Bubber, Inc., 27,475 (La.App. 2 Cir. 11/1/95); 662 So.2d 808, writ denied, 96-37 (La.2/28/96); 668 So.2d 369. In other words, an appellate court cannot modify a trial court's award of damages unless it is not supported by the record. Charles v. Arceneaux Ford, Inc., 542 So.2d 846 (La.App. 3 Cir.1989).
George Bartmess testified that, prior to the seizure, he had an arrangement with Carl Herring, the owner of Wisner Minnow Hatchery, Inc., whereby he would exchange catfish for feed. Bartmess explained that he would receive three or five loads of feed from Herring on credit and then he would eventually bring Herring a load of catfish to balance his account. Bartmess stated that, two or three days after DWF's seizure, he ran out of feed for his alligator/catfish operations. At that point, Bartmess testified, he went to Herring and requested "another load of feed." However, Bartmess stated that Herring refused because Bartmess had a "pretty good amount outstanding." He further stated that Herring informed him that Wisner Minnow Hatchery would not give him any more feed until he brought some catfish to balance his outstanding debt. Bartmess then stated that he could not bring any catfish to Herring because of DWF's constructive seizure; therefore, he could not obtain any feed for his farm.
*1104 Carl Herring corroborated Bartmess' testimony on this issue. Herring testified that he owned a catfish processing and feed mill business that was adjacent to Bartmess' farm in Franklin Parish. Herring stated that he had an "arrangement" with Bartmess whereby Bartmess would "swap fish for feed." Herring further stated, that under the arrangement, he would sell three or five loads of feed on credit and then Bartmess would bring him catfish to "balance back out." Herring testified that he could not sell Bartmess any feed on credit after DWF's seizure because Bartmess could not bring him any catfish to pay his balance. Herring also stated that Bartmess brought him some catfish after DWF lifted the seizure on the catfish operations. Herring noted that the condition of the catfish was "real poor" and that it was not customary for Bartmess to bring that kind of catfish.
Otis Randall, who was accepted by the trial court as an expert in the economics of catfish farming, testified that the primary catfish growing season was from April to the end of November. Randall explained that this was the primary season because the water temperature would be warm and this increases the metabolism of the catfish. Randall stated that during the growing season "when the fish are active and you're ... you're trying to get some (weight) gains, as quick as you can, you would normally feed every day."
Bartmess testified that he did not feed his catfish "anything" from August 10, 1991 until September 19, 1991, when he received the letter from DWF informing him that his catfish operations were not under the constructive seizure. He stated that in late September 1991, he took some catfish out of his ponds:
We measured the samples and ... and weighed them. And, Cargill, Al Cobb, who manages the Cargill Processing Plant, had a book that's published, I guess, in Mississippi, on ... on the weights that a fish ... they use that. They weighed fish. If fish didn't meet this weight, they considered it non-processible. And, ... because they would lose money on the percent cutout. He gave me a copy of that chart and ... and I measured the fish and we deducted what they should weight to sell from the weight that they weighed, and they were something like thirty-five to forty percent off weight of what was considered by Cargill to be a marketable fish.

* * * * * *
I went and got Robert Ferrington and Charles Leslie Ferrington, catfish farmers, to come and look at them. They estimated them between thirty-five and forty-five percent off. And Allen Trehern, the guy... the seining crew, I got him to look at them and he said that they lost a third or better. And then, the photographs and the schedule that they go by verified all of that.
Bartmess stated that Herring allowed him to collect all the fish scraps from Wisner Minnow Hatchery without charge. Bartmess further stated that after September 19, 1991, he began to feed his catfish the fish scraps (catfish heads, guts, and backbones). He testified that his catfish began to gain weight and that he was "bringing them back" during the fall of 1991.
The trial court, in awarding Bartmess damages for the weight loss of his catfish, stated in part:
Because of the constructive seizure, Bartmess was unable to purchase feed for his catfish, resulting in the fish losing weight. Bartmess was unable to swap fish for feed with his supplier under a previous agreement before the seizure. These problems persisted through the fall of 1991. The evidence indicates that in December of 1991, Bartmess had 750,000 pounds of catfish in his ponds. These fish had lost thirty-five percent (35%) of their body weight and gained ten percent (10%) back leaving a total loss of 250,000 pounds because Bartmess' inability to feed his fish. The evidence indicates that this loss should be valued at forty-six cents (46¢) per pound.[15] This results in a total loss to Bartmess of $115,000.00, which is directly *1105 attributable to the wrongful seizure by D.W.F. agents.
After a review of the record, we cannot conclude that the trial court clearly abused its discretion in awarding Bartmess $115,000.00 for the weight loss of his catfish due to DWF's constructive seizure.
Regarding the liquidation of the alligators, the record substantiates that DWF gave Bartmess permission in April 1992 to sell approximately 7,294 alligators to Robert C. Ferrington for $300,000.00. Bartmess testified that he was forced to liquidate his entire herd of alligators because Capital Bank "was on my back to bring them some money." In fact, he stated that he sold "a lot of construction equipment and farm equipment" that were not encumbered by mortgages "to try to stay afloat." Bartmess further testified that he could have negotiated a higher price for his alligators if he could have sold them piecemeal. However, he stated that DWF informed him that he could not sell piecemeal, but had to sell his entire herd of alligators. Ted Joanen, who, as previously stated, was accepted as the expert in alligators, unequivocally testified that the total value of Bartmess' alligator herd at the time of the transfer to Robert C. Ferrington was approximately $520,000.00.
Further, Joanen testified that Bartmess ran into "tremendous problems" because of DWF's constructive seizure. He stated that the seizure would have a "devastating effect" on Bartmess' breeder stock if any problems arose in feeding, caring for, or maintaining the alligators. He further stated that because Bartmess owned a large inventory of alligators and was unable to do anything with his alligators for eight to nine months, problems developed. He testified that the alligators' growth exceeded the space allotted to them in their heated, controlled environment.[16] Joanen noted that this caused the alligators to begin to fight with each other and, as a result, their stress level was heightened. Consequently, Joanen indicated, diseases developed because of the breakdown in the alligators' immune system, which resulted in a deterioration of skin quality.
Joanen then observed that the seizure could not have come at a worst time. He stated that the seizure put Bartmess "in a bind." He testified that Bartmess' crowded inventory of alligators could not be sold during a time of declining prices and that, even if they could be sold, Bartmess would be compelled to sell at a reduced price because of the deterioration in quality.
The trial court awarded Bartmess $220,000.00 for his loss when he was forced to sell his alligators at a reduced price. We therefore conclude that the trial court did not clearly abuse its discretion in granting this award.
We now turn to the trial court's awards of future lost profits to the plaintiffs for their alligator and catfish operations.
Damages in the nature of lost profits resulting from an offense or quasioffense must be proved with reasonable certainty, that is, that the loss of future profits is more probable than not. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983); Graham v. Edwards, 614 So.2d 811 (La.App. 2 Cir.), writ denied, 619 So.2d 547 (La. 1993). However, broad latitude is given in proving lost profits because this item of damages is often difficult to prove and mathematical certainty or precision is not required. See Fritscher v. Chateau Golf & Country Club, 453 So.2d 964 (La.App. 5 Cir.), writ denied, 460 So.2d 604 (La.1984); Lavigne v. J. Hofert Company, 431 So.2d 74 (La.App. 1 Cir.1983). But, damages cannot *1106 be awarded where lost future profits are based purely on conjecture and speculation. Graham, 614 So.2d 811. The allowance of loss of profits as an element of damages is more liberal in tort actions than actions for breach of contract. Barnett v. Jabusch, 94-819 (La.App. 3 Cir. 2/1/95); 649 So.2d 1158; Haggerty v. March, 480 So.2d 1064 (La.App. 5 Cir.1985); Dubois v. State Through Dept. Of Pub. Safety, 466 So.2d 1381 (La.App. 3 Cir.1985). The judge or jury has much discretion in the assessment of damages in tort cases. La.Civ.Code art. 2324.1. An appellate court cannot disturb a damage award made by the trial court in the absence of a clear abuse of discretion. In other words, a damage award cannot be modified by the appellate court unless it is not supported in the record. Evangeline Farmers Cooperative v. Fontenot, 565 So.2d 1040 (La.App. 3 Cir.1990).
The defendants argue that the trial court erred in awarding the plaintiffs future lost profits in their alligator and catfish operations. The plaintiffs, who answered the appeal, request that we increase their awards. We address their arguments together.

II. LOST PROFITS ON THE ALLIGATOR OPERATIONS
Bartmess testified that he entered the alligator farming business in approximately 1986. Bartmess testified that he went to Rockefeller Refuge and talked to Larry McNease and Ted Joanen and that they convinced him that "alligator ranching could become very profitable." He stated that, in order to operate his alligator farm, he secured a "90/10" loan from Capital Bank, whereby Capital Bank extended him a $350,000.00 line of credit. Bartmess indicated that, at the time of the constructive seizure, he had approximately 7,200 alligators on his farm and was receiving hatchlings every year from DWF. Bartmess admitted that, on his Federal Income Tax Returns from 1986 1990, he had suffered losses every year except 1988 when he made a $47,791.00 profit on his farming operations. However, he explained why he had suffered these losses during those years:
All right. If ... if you notice on my income tax, I kept building or maybe not on my income tax, but my alligator reports and what-not, I kept building fish stock and alligator stock. I kept applying a lot of money back into growing. Building facilities, and charging ... charging it off up front instead of depreciation over a period of time. Because I'd ... I'd build a lot of it myself and buy the supplies. Instead of deducting a whole building over five years, I deducted all the supplies....And my game plan was to build my stocks and try to hit a home run. And that's what I was doing all this time.
Bartmess testified that, prior to the seizure, he had entered into an oral agreement with Mike Fonseca, a partner in Cajun Alligator Farm, whereby Fonseca had tentatively agreed to send him 10,000 to 12,000 hatchlings per year. Fonseca corroborated Bartmess' testimony. Bartmess stated that he would pay Fonseca $20.00 for each hatchling and that when these alligators were mature enough to harvest, Fonseca would pay him the "top international price" for the skins. Bartmess further stated that he would have to build "more facilities" in order to take care of these additional hatchlings.
Ted Joanen testified that Bartmess had "one of the better farms" in the state. He stated that Bartmess did a "tremendous job" setting up his farm and even went beyond DWF recommendations. In fact, Joanen acknowledged that Bartmess had better "breeder pens" at his farm than DWF did at Rockefeller Refuge. He further stated that Bartmess was a "perfectionist" with his handling and caring for his alligator herd. When Joanen was asked to describe the condition of Bartmess' alligator herd before the seizure, he replied:
They were real nice, real fine animals. Well cared for. Fat, robust. Very healthy animals.
In fact, Joanen described Bartmess' alligators as "above average." He stated that Bartmess was in DWF's "Supplemental Program" whereby Bartmess would receive a certain number of hatchlings every year from DWF. He further stated that Bartmess was *1107 deprived of about 1,500 to 2,000 hatchlings because of DWF's seizure.
When Joanen was asked about the impact of DWF's seizure on Bartmess' alligator operation, the following colloquy took place:
Q. If Mr. Bartmess were immediately stopped from receiving these hatchlings from Louisiana Department of Wild Life [sic] & Fisheries and can't continue to harvest his herd and carry on his sperming operation, would that have any type of effect on his long range ability to raise alligators?
A. Yes sir. It would have a definite economic impact on him, no doubt about it. Tremendous impact.
Q. Explain that, please sir.
A. Okay. If Mr. Bartmess was just at a period where ... the visits we made to the farm, he was putting a lot of money back into the farm. Building more sheds, getting bigger freezers. So all his money, looked like, was going back into the operation. In 1971, he had his largest number of animals on his farm.
Q. '71?
A. Excuse me, '91. He had over seven thousand animals. So that year, he would have experienced a good income. And that was the year where he had all these ... the problems with... with the ... with the agent. So it really did set him back. There's no two ways about.
Larry McNease, who had been employed by DWF for 26 years, was accepted by the trial court as an expert in the economics of alligator farming. McNease testified that Bartmess was "one of the better farmers" in the state. McNease produced "a fairly extensive group of tables" to indicate, in his view, Bartmess' economic losses as the result of DWF's seizure on August 10, 1991. McNease calculated Bartmess' alligator production based on the "Rockefeller Refuge Best Care Scenario Breeding Pen Production Data." McNease indicated that the number of alligators were based on Bartmess' previous annual reports that were turned in to DWF, the anticipated hatchlings that Bartmess would receive from the "Supplemental Program," and the alligator hatchlings that Bartmess had orally agreed to purchase from Mike Fonseca. McNease also figured expenses to include food costs, start up costs for additional buildings, and additional ponds and fences. McNease opined, based upon a very detailed computation through the year 2003, that Bartmess would suffer $22,533,375.48 in future lost profits. McNease based his calculations upon these factors: (1) Bartmess' hatchlings would take two years to mature to a size of five feet (harvest size); (2) Bartmess would harvest 178,217 alligators; and (3) projected profit per alligator of $126.44.
Ernest Moser, an Associate Professor of Economics and Finance at Northeast Louisiana University, testified that he was hired by Bartmess to calculate his future losses on the alligator operation because of DWF's seizure. Moser stated that in arriving at his calculations he relied upon McNease's report and tables. He also stated that this was the first time that he ever did an "economic impact report" on an alligator farm. Moser also testified that he "pretty much ignored" Bartmess' Federal Income Tax Returns in attempting to formulate Bartmess' future loss profits. Moser specifically stated:
The other thing that I ... I got the impression from ... that this was a ... it was in the building stage. And so building stages, you've got ... you incur a lot of costs up front. Costs that are later recovered from revenues as you sell the product. And so, I know he was adding alligator ponds or whatever you call the places,.. the pens, I think, is what you call them. Alligator facilities.
Moser then testified that the first thing he calculated was Bartmess' work life expectancy, which he explained is "how long we would expect an individual of a certain age to continue working." He then stated that he calculated Bartmess' work life expectancy, from March 1994, to be 9.5 years. However, Moser explained "businesses don't necessarily... business owners don't necessarily stop working at the end of nine and a half years. It's just the standard place to cut off the future loss." Moser also testified that he used a 7.0% discount rate to calculate Bartmess' *1108 future loss into a present value. He indicated that he arrived at this figure by looking at the interest rates of 30 year and 10 year government bonds. He further stated that on 30 year bonds, the interest rate was about 6.8% and that on 10 year bonds, the interest rate was about 5.8% to 6.0%. Moser said that the lower the discount rate, the higher the present value of Bartmess' future loss would be. Finally, Moser opined that Bartmess suffered (1) future lost profits (for a 9.5 year period) of $12,082,035.66 on his alligator operations because of DWF's seizure and (2) past losses (from August 1991 until trial) of $147,058.80.
Kenneth Boudreaux, a Professor of Economics and Finance at Tulane University, testified that he was hired by the defendants to analyze Bartmess' Federal Income Tax Returns for the period of 1986 through 1992 to project Bartmess' loss of future profits, if any, caused by DWF's seizure. Boudreaux testified that Bartmess' "past performance" in his alligator operations as revealed in his tax returns would be the "most important basis" for projecting his future performance.
Boudreaux testified that, from 1986 through 1990, Bartmess lost about $80,000.00 per year on his farming operations. He further noted that, included in that calculation, was the fact that Bartmess made approximately a $48,000.00 profit in 1988. In fact, he testified that in the two years preceding DWF's seizure (1989 and 1990), Bartmess had lost a total of about $300,000.00. Boudreaux then opined that, based upon Bartmess' tax returns, that he could not have made the profits that his experts, McNease and Moser, opined.
After hearing this evidence, the trial court stated:
As a result of the wrongful seizure and the wrongful revocation of his alligator license, plaintiff lost his whole alligator farming operation. Plaintiff contends that he had plans to expand his operation to a point where he would be harvesting approximately 12,000 alligators per year. Such an expansion would entail extensive capital investments. To award plaintiff lost profits on the basis of this projected expansion is too speculative and is rejected by the Court. The evidence does show that plaintiff would continue at least at his present levels in his alligator farming operation (7,200 head). The experts that testified at trial on behalf of plaintiff projected a best-case scenario of a two year maturation of hatchlings. The Court views this two year period as the absolute best-case scenario, and it is the opinion based on the testimony of the various experts that a two and a half (2.5) year maturation period would be more appropriate. Under these holding, [sic] it is projected that Bartmess would harvest 2,880 alligators per year with the projected profits of $97.51[17], resulting in a total projected yearly lost future profit to plaintiff of $280,828.80. The projected present value of the lost future profits on Bartmess' alligator profits over the nine and a half year (9.5) year projected period used by the experts total $1,945,000.00 in lost future profits for the Bartmess alligator operation. This calculation is based on a discount rate of six point five percent (6.5%).
In the case sub judice, the trial court was faced with conflicting testimony regarding the amount of lost profits suffered by the plaintiffs. Based upon this evidence, we cannot conclude that the trial court clearly abused its discretion in its award of future lost profits to the plaintiffs. The trial court's award of future lost profits to the plaintiffs was supported by the record. Therefore, we find that defendants' argument on this issue is without merit.[18]

*1109 III. LOST PROFITS ON THE CATFISH OPERATIONS
Bartmess testified that he had a 160 acre alligator/catfish farm in Franklin Parish and an 810 acre fish farm in Catahoula Parish. He stated that he did not own the farm in Catahoula Parish, but that he leased this property from B.E. Quinn & Sons. Bartmess also stated that he did not feed his fish "anything" from August 10, 1991 until September 19, 1991, when he was notified by DWF that his fish operations were not covered by the constructive seizure. When Bartmess was asked whether, in September 1991, he was concerned about his Catahoula farm being seized, he replied "Not at that time, no sir." Bartmess further testified that he began to feed his fish again after DWF notified him on September 19, 1991 that his fish operations were not under the constructive seizure. In fact, he acknowledged that his fish began to gain weight back and that he had "salvaged" most of his fish at the alligator farm. Bartmess stated that he lost the lease on his fish farm in Catahoula in April or May 1992 because he did not have money to pay the lease. But, at trial, Bartmess indicated that he was still farming catfish.
Carl Herring, the owner of Wisner Minnow Hatchery, testified that, after DWF informed Bartmess that the constructive seizure did not affect his fish operations, Bartmess began to bring him fish to exchange for feed:
Q. Okay. Now, you didn't deny Mr. Bartmess credit because his farm was under seizure, did you? You denied him credit because he couldn't bring you fish, or said that he couldn't bring you fish.
A. Right.
Q. And he had maxed out his credit, right?
A. Right.
Q. Now shortly after the seizure, Mr. Bartmess started bringing you fish again, correct?
A. Correct.
* * * * * *
Q. And after he started bringing you fish, you started giving him feed again, right?
A. Sometimes after that, yes sir. Sure did.
Q. So this was a temporary problem, right?
A. Right.
Q. And then, after Mr. Bartmess started bringing you fish, you went right back to the ... to the procedure you had with him before, right?
A. Right.
Q. He'd bring you fish, you'd give him feed.
A. Right.
As previously stated, the trial court awarded the plaintiffs $2,250,000.00 in future lost profits on their catfish operations for a 9.5 year period. However, we conclude that the trial court clearly abused its discretion in awarding future lost profits on the catfish operations because: (1) DWF notified Bartmess in writing on September 19, 1991, approximately six weeks after the seizure, that his catfish operations were not constructively seized; (2) Bartmess began to feed his catfish in September 1991 and the catfish were gaining weight in December 1991; (3) Bartmess began to sell catfish after DWF informed him that his fish operations were not covered by the constructive seizure; (4) Herring indicated that Bartmess' problems were "temporary" and that, after DWF lifted the seizure on his fish operations, Bartmess began to exchange fish for feed as he previously did before the seizure; (5) Bartmess stated that he could not make the payments on the Catahoula farm some seven to eight months after DWF informed him that his fish operations were not seized; and (6) Bartmess, at trial, stated that he was still farming catfish. The record substantiates that Bartmess could continue his fish operations after September 19, 1991. Therefore, we conclude that the trial court clearly *1110 abused its discretion in awarding lost future profits for the plaintiffs' fishing operations, including the Catahoula farm, when the record substantiates that Bartmess could operate that farm.

IV. MENTAL ANGUISH
The trial court awarded George and Helen Bartmess, each, $35,000.00 for their mental anguish and suffering. The trial court specifically found that they have "seen their life work lost" and that they "suffered severe mental distress as their farming operation disintegrated because of the seizure of their assets."
Damage for mental anguish, aggravation, distress and inconvenience are recoverable in tort actions under La.Civ.Code art. 2315. See Gele v. Markey, 387 So.2d 1162 (La. 1980); Meador v. Toyota Of Jefferson, Inc., 332 So.2d 433 (La.1976). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), the Louisiana Supreme Court discussed the appellate standard of review for general damages, such as mental anguish:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
George Bartmess testified that DWF's constructive seizure "strained" his relationship with his family. In fact, he described that he was "short fused" and "real irritable" after the seizure. He further explained that he was "hard to get along with" after the seizure. He testified that he even discussed ending his marriage to his wife and that the seizure also affected the relationship with his children because "[t]hey don't come around very much." Finally, Bartmess stated that he was forced into Chapter 12 bankruptcy because of DWF's seizure.
When Helen Bartmess was asked how DWF's seizure affected her, the following exchange took place:
Q. Okay. How has this seizure affected your relationship with Mr. Bartmess?
A. It's pretty strained.
Q. Explain that to us.
A. Well, we don't have much positive communication. And he is very irritable, very short fused. And I can ask a question or make a statement, and he'll harp on it for thirty minutes. It just irritates him.
Q. How does ... how does this reaction compare to the way he would react to a similar situation before the seizure?
A. Well, he was ... he had a different personality. I mean, he wasn't like that. Now, don't get me wrong now. He's always had a temper. But he... I mean, he's not ... you know, he didn't fly off just so short fused.
* * * * * *
Q. Have you observed any difference in the relationship that you or your husband had had with your children or grandchildren after the seizure?
A. Well, they really don't come around as often as they once did, and when they come, they don't stay very long.
Q. Have they told you why?
A. Well, our son and daughter don't say much, but our son, you know, just says he's too grouchy.
Q. Okay. What ... what impact did it have on you, Mrs. Bartmess, when you and Mr. Bartmess were forced to file Chapter Twelve Bankruptcy?

*1111 A. Well, I mean, I've always had pride. And to me, bankruptcy stripped me of my pride.
* * * * * *
Q. Since the seizure, have you and Mr. Bartmess ever had discussions about divorce?
A. Yes. I've mentioned it.
Q. Tell us about that, please m'am.
A. Well, he's just so short fused and hard to get along with, `til I ... I have threatened to leave several times.
Q. Had you threatened to leave Mr. Bartmess before this incident?
A. No.
After a review of the evidence, we do not conclude that the trial court abused its vast discretion in awarding the plaintiffs, each, $35,000.00 for mental anguish.

LEGAL INTEREST: DATE OF ACCRUAL
The trial court awarded the plaintiffs legal interest on the judgment from the date of judicial demand. Defendants argue that, with respect to attorney's fees and costs, future economic damages, and punitive damages, the trial court erred in awarding legal interest from the date of judicial demand. Because of our disposition of the § 1983 claim, defendants' arguments regarding attorney's fees and punitive damages are now moot. However, we will address the remaining arguments in turn.

A. COSTS
Defendant asserts that the trial court erred in granting judicial interest on costs from the date of judicial demand. This would be an issue requiring consideration. See Cajun Electric Power Cooperative v. Owens-Corning Fiberglass Corporation, 616 So.2d 645 (La. 1993). But, after reviewing the judgment in this case, we disagree that the trial court assessed legal interest on court costs. In the final judgment rendered in this case, the trial court entered judgment against the defendant for monetary sums, "together with legal interest thereon from date of judicial demand, attorney fees under the provisions of 42 U.S.C.1988, and all costs of these proceedings." The trial court did not award interest on court costs. Since we observe that defendant's assertion that the trial court awarded interest on costs appears to be factually incorrect, we deem it unnecessary to address this contention further, as it is without merit.
However, because the trial court failed to assess costs of the proceedings in a specific dollar amount in accordance with La.R.S. 13:5112, we will reform the judgment to enter a specific dollar amount for all costs, including those of the lower proceedings.

B. FUTURE ECONOMIC LOSSES
Defendants argue that the trial court erred in awarding pre-judgment interest on the plaintiffs' award for future economic losses. We find no error. La.R.S. 13:4203 specifically provides that the court shall award interest from the date of judicial demand. No differentiation is made between those elements of quantum which recompense for past losses and those which recompense for future losses. Tastet v. Joyce, 531 So.2d 520 (La.App. 5 Cir.1988). In fact, courts have awarded legal interest on future damages from the date of judicial demand. See Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1 Cir.), writs denied, 605 So.2d 1099, 1100 (La.1992); Bruce v. Rogers Oil Tool Services, Inc., 556 So.2d 922 (La.App. 3 Cir.1990); Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1 Cir.1987), writ denied, 520 So.2d 750 (La.1988). Therefore, we conclude that the trial court properly awarded legal interest from the date of judicial demand on the future economics losses award.

DECREE
For the foregoing reasons, we reverse (1) the trial court's award of punitive damages and attorney's fees against DWF and its three agents, Eubanks, Bonner, and Ferrington; (2) the trial court's finding of liability on the compensatory damages against Eubanks, Bonner, and Ferrington; and (3) the trial court's award of $2,250,000.00 in future lost profits on the Bartmess' catfish operations. Additionally, because the *1112 trial court failed to assess the costs of the proceedings in a dollar amount in accordance with La.R.S. 13:5112, we reform the judgment of the trial court to enter a dollar amount for all costs, including costs of the lower proceedings. In all other aspects, we affirm the trial court's judgment. Accordingly, we recast the judgment as follows:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that all of plaintiffs' claims and/or demands asserted under 42 U.S.C.1983, et seq., including plaintiffs' demands for punitive damages and attorney's fees, are hereby dismissed, with full prejudice.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all of plaintiffs' claims and/or demands regarding future lost profits on the catfish farm operations are hereby dismissed, with full prejudice.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED all of plaintiffs' claims and/or demands against defendants, CLIFTON EUBANKS, JOHNNY FERRINGTON and EMMITT BONNER, in their individual and/or official capacities, are hereby dismissed, with full prejudice.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein for damages in favor of GEORGE and HELEN BARTMESS and against STATE OF LOUISIANA THROUGH DEPARTMENT OF WILDLIFE & FISHERIES in the sum of TWO MILLION THREE HUNDRED AND FIFTY THOUSAND ($2,350,000.00) DOLLARS, together with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of these proceedings, including costs of the trial court and of this appeal, in the total amount of $11,971.70, are assessed against STATE OF LOUISIANA THROUGH DEPARTMENT OF WILDLIFE & FISHERIES.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
THIBODEAUX, Judge, concurring in part and dissenting in part.
I concur in the majority's award of $2,350,000.00 to the plaintiffs. I dissent from the majority's refusal to find liability under 42 U.S.C. § 1983 and its refusal to award $2,250,000.00 in future loss profits under Bartmess' catfish operations.

I.

42 U.S.C. § 1983 Liability
The old sixteenth century English maxim that the King can do no wrong is alive and well in Louisiana in 1996. The majority's holding that the State, State agencies, and its agents are not amenable to suit and liability under 42 U.S.C. § 1983 because they are not "persons" resurrects the anachronistic doctrine of the infallibility of the sovereign. The State is thus exempted from all liability for constitutional torts. Individual citizens are now left "holding the bag," so to speak, without a remedy in either state or federal court to redress violations of constitutional proportions.
Louisiana's professed immunity to suit under Section 1983 is not absolute. The waiver of sovereign immunity in La. Const. art. XII, § 10 abrogates any immunity Louisiana once enjoyed. Article XII, § 10's language, "neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to a person or property," is plain, unambiguous, and exceptionless. It does not state, "except for claims brought under 42 U.S.C. § 1983."
To recover under § 1983, a plaintiff must allege and prove two essential elements. First, a plaintiff must show that the violative conduct occurred under color of state law. Moresi v. State, Through Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990). Second, a plaintiff must show that this conduct deprived her/him of a right, privilege, or immunity secured by the Constitution or a law of the United States. Accredited Sur. and Cas. Co., Inc. v. McElveen, 93-678 (La.App. 3 Cir.); 631 So.2d 563, writ denied, 94-0915 (La.5/20/94); 637 So.2d 483. In the present case, it is undisputed that the DWF agents' conduct occurred under color of state law, *1113 and that such conduct deprived Mr. and Mrs. Bartmess of rights secured by the Constitution. That is, the Bartmesses alleged, and the trial court concluded, that DWF officials violated their constitutional protection from unreasonable seizures, and deprivations of property without due process of law. These findings are not clearly wrong. However, § 1983 renders only "persons" liable for deprivations of citizens' constitutionally or statutorily protected rights. The Department of Wildlife & Fisheries astutely contend that neither the State nor its agents sued in their official capacity are § 1983 "persons."
Under § 1983, State agents sued in their individual, personal, or private capacity are subject to § 1983 liability because the Supreme Court, in Hafer v. Melo, 502 U.S. 21, 25-27, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991), clearly explained that, "[O]fficers sued in their personal capacity come to court as individuals. Thus, a government official in the role of personal-capacity defendant fits comfortably within the statutory term person." Hafer at 27, 112 S.Ct. at 362. Appellants do not contest this matter; therefore, in the context of this case, the pivotal inquiry becomes whether the State of Louisiana (i.e., the DWF) and its agents sued in their official capacity are statutory "persons" under § 1983.
Appellants contend that the foregoing question is controlled by our ruling in LaBauve v. State, 618 So.2d 1187 (La.App. 3 Cir.), writ denied, 624 So.2d 1235 (La.1993), and the United States Supreme Court's decision in Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). However, Labauve did not consider whether shielding Louisiana and state officials sued in their official capacity from § 1983 liability is consistent with Article XII, § 10. Furthermore, since the trial court's refusal to award damages under § 1983 was affirmed, it was not necessary to reach the issue of § 1983's application. That language was superfluous dictum. In Will, the Court opined:
Obviously, state officials literally are persons. But a suit against a state official in her or his official capacity is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself. We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.
Will, 491 U.S. at 71, 109 S.Ct. at 2312.
As a basis for the Will decision, Justice White explained, "[The Court] cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent." Id. at 67, 109 S.Ct. at 2310. (emphasis added). It is noteworthy to observe that the dispute in Will arose in Pennsylvania. Pennsylvania law does not allow a broad waiver of sovereign immunity. Article I, § 11 of the Pennsylvania constitution provides that "[s]uits may be brought against the Commonwealth in such manner, in such courts, and in such cases as the Legislature may by law direct." 16 Pa. Cons.Stat. § 13112 states in pertinent part that:
It is hereby declared to be the intent of the General Assembly that the authority created pursuant to this act and its officers, officials and employees shall enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 ... and remain immune from suit except as provided by and subject to the provisions of 42 Pa.C.S. § 8501 through 8528.
1 Pa. Cons.Stat. § 2310 declares:
Pursuant to section 11 of Article I of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) unless otherwise specifically authorized by statute.
Thus, a limited grant of sovereign immunity is firmly imbedded in Pennsylvania law. *1114 It is waived only in clearly delineated circumstances. 42 Pa. Cons.Stat. § 8522(b) titled "Exceptions to sovereign immunity" lists nine such instances: vehicle liability, medical-professional liability, care, custody or control of personal property, commonwealth real estate, highways and sidewalks, potholes and other dangerous conditions, care, custody or control of animals, liquor store sales, National Guard activities, and toxoids and vaccines. Subsection (a) of that statute states clearly:
The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.
Causes of actions are allowed, therefore, in those circumstances where Pennsylvania has expressly given its consent.
The trial court determined that Louisiana and its agents are statutory persons under § 1983 because Louisiana consents to disregard its sovereign immunity in delictual actions via La. Const. art. XII, § 10; therefore, Louisiana may be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the alleged unconstitutional action implements or executes a regulation, ordinance, policy statement, or decision officially adopted and promulgated by state officers. See Monell v. Dept. of Social Serv. of New York, 436 U.S. 658, 688-90, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). I agree.
In Louisiana, the sovereign immunity doctrine stands at odds with the state's policy of requiring its agencies to either act responsibly, or be subject to answer in court. Chamberlain v. State, Through Dept. of Transp. & Dev., 624 So.2d 874, 881 (La.1993). Louisiana Constitution Article XII, § 10 provides:
(A) Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
Since its 1974 enactment, courts have welcomed this constitutional waiver of sovereign immunity and have given it broad effect. Robertson, Tort Liability of Governmental Units in Louisiana, 64 Tul. L.Rev. 857, 864 (1990). By its very terms, Article XII, § 10(A) is an unequivocal waiver of governmental immunity from suits and liability in tort. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980). (Emphasis added). Article XII, § 10(A) requires that Louisiana's liability, and also its substantive defenses, be the same as that of a similarly situated private-party defendant. See Rick v. State Dept. of Transp. & Dev., 93-1776; 93-1784 (La.1/14/94); 630 So.2d 1271; Segura v. Louisiana Architects Selection Board, 362 So.2d 498 (La.1978) (statute relieving the state of liability for court costs violated the constitutional waiver because it exempted the state from liability that a private-party defendant would have to bear). This mandate holds special significance when construed in the context of § 1983 because state officials sued in their private capacity (i.e., similarly situated private-party defendants) are statutory persons subject to § 1983 liability. Hafer, at 25-27, 112 S.Ct. at 362. Accordingly, Article XII, § 10 compels the DWF and its agents sued in their official capacity to bear the same liability as any DWF official sued as a private party defendant.
For these reasons, the trial court's decision that the DWF (i.e., the State of Louisiana) and its agents sued in their official capacity are statutory persons subject to § 1983 liability is correct.
My position is buttressed by recent developments in Louisiana's legislative and political arenas. By Act 1328 of 1995, a proposal to amend La. Const. Art. XII, § 10(C) was submitted to the voters of Louisiana on October 21, 1995. The voters' approval made it effective on November 23, 1995. It reads:
(C) Limitations; Procedure; Judgments. Notwithstanding Paragraph (A) or (B) or any other provision of this constitution, the legislature by law may limit or *1115 provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. It shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered. (emphasis added).
The House Committee on Appropriations discussed at length House Bill No. 841 which became Act. No. 1328. The minutes of the committee meeting reflect that Representative Elias Ackal, Chairman, stated the bill had been introduced to reduce the liability exposure of the state. Representative Francis Thompson explained that this legislative enactment would attempt to reverse the deterioration of the sovereignty of the state in legal disputes.
It is now clear that the legislature has the authority to limit the State of Louisiana's liability in all cases where it may otherwise be culpable. (How this newly-enacted section 10(C) interacts with or modifies section (A) is an issue left for another day). The Louisiana legislature may now articulate the liability exposure of the state in certain circumstances, just as Pennsylvania does.
The need for this constitutional amendment clearly demonstrates, in my view, the idea that Article XII, § 10(A) exposes the state to any claim in tort without an exception to a cause of action under 42 U.S.C. § 1983. The amendment to Article XII, § 10(C) permits the legislature to limit or modify the extent of the liability of the state and its agencies. As this circuit stated in Losabia v. Cypress Hospital, 619 So.2d 151, 154 (La.App. 3 Cir.), writ denied, 625 So.2d 1047 (La.1993): "It is presumed that every word, sentence, or provision in law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used."
The majority places heavy reliance on Howlett by and Through Howlett v. Rose which stated that "[a] state may not, by statute or common law, create a cause of action under Section 1983 against an entity whom Congress has not subjected to liability...." Howlett, 496 U.S. at 376, 110 S.Ct. at 2442-2443. The real issue, it seems to me, is whether the state can create a cause of action against an entity which Congress has not exempted from liability? Certainly it can. Furthermore, Congress has subjected the states to liability under Section 1983 through a state's power to waive its Eleventh Amendment immunity and its immunity to suits under 42 U.S.C. § 1983. The jurisprudence supports this view.
Immunity that has been traditionally enjoyed may be waived. In Port Authority Trans-Hudson Corporation v. Feeney, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), the United States Supreme Court sanctioned a statutory waiver of Eleventh Amendment immunity and allowed suit to proceed in federal court against a state agency. While we are not concerned with any Eleventh Amendments questions in this case to which Port Authority Trans-Hudson Corporation addressed itself, some observations in that case are instructive.
Port Authority Trans-Hudson Corporation suggested that a waiver of Eleventh Amendment immunity must be specific. In clothing the relevant New York and New Jersey statutes with the required specificity to effect a waiver, the Supreme Court stated that a provision which contains the language "consent to suits, actions, or proceedings of any form or nature at law, in equity or otherwise," Id. at 306, 110 S.Ct. at 1873 could very well be interpreted as a consent suit in federal and state courts. However,
such a broadly framed provision may also reflect a state's consent to sue in its own courts. Sensitive to the values underlying the Eleventh Amendment, the Court has required that consent to suit in *1116 federal court be expressed and thus has construed such ambiguous and general consent to suit provisions, standing alone, as insufficient to waive Eleventh Amendment immunity. (emphasis supplied).
While it is clear that a general constitutional or statutory consent may not be sufficient to waive Eleventh Amendment immunity, the quoted language is certainly indicative that a state's consent to be sued in its own courts can be structured in the broadly framed language of La. Const. art. XII, § 10.
Unfortunately, the duty of responsible action that a democratic government bears to its citizens has been diminished as a consequence of our actions today. The State of Louisiana, its agencies and State officials may now commit constitutional torts with impunity, comforted by the reality that their transgressions are protected by the judicial imprimatur which we extend to them through this decision.
Hopefully, the day will come when our courts will more vigorously protect individual rights and the privileges which our individual citizens deserve will equal the deference which is routinely granted to the State, arms of the State, and State officials.

II.

Trial court's conclusion that the DWF seizure was prompted by evil motive or intent/reckless or callous indifference to plaintiffs' rights was not clearly wrong. Plaintiffs are entitled to $3 million in punitive relief.
Punitive damages are only recoverable under 42 U.S.C. § 1983 "when a defendant's conduct is shown to be prompted by evil motive or intent, or when said conduct involves reckless or callous indifference to plaintiff's federally protected rights." Smith v. Wade, 461 U.S. 30, 57, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); Booze v. City of Alexandria, 94-0763 (La.4/4/94); 637 So.2d 91. In arriving at its punitive damages conclusion, the trial court observed that the DWF seizure completely deprived Bartmess of the opportunity to earn a living through his farming operations, noting that:
The DWF and its agents' course of action from August 10, 1991 on would indicate a clear desire to put Bartmess out of business. actions were not of a rogue agent, but a systematic course of conduct of numerous DWF personnel who were involved in the case, including supervisory officials. For seasoned DWF personnel to act in such a manner in direct contravention of their own policies and procedures demonstrates a course of conduct designed to destroy Bartmess economically. (emphasis supplied).
One of the primary reasons for allowing punitive damages in § 1983 actions is to deter future egregious conduct that violates federally protected rights, Brown v. Bryan County, Ok., 67 F.3d 1174, 1181 (5th Cir. 1995); Sockwell v. Phelps, 20 F.3d 187 (5th Cir.1994), because society has an overriding interest in deterring and punishing all intentional or reckless invasions of the rights of others. Smith, 461 U.S. at 55, 103 S.Ct. at 1639. Though criminal law is the traditional vehicle through which courts deter and punish egregious misbehavior, we recognize that ascribing criminal liability to individuals within an agency is exceedingly difficult because agency decision-making is normally multi-tiered and diffuse. Ranier, Exemplary Damages: Checks & Balances on Corporate America, 43 No. 3 La. Bar J. 256 (1995). Punitive damages are an effective means of punishing reckless agency activity, and checking agency decision-making that is otherwise beyond judicial review. Because these damages are available, irresponsible agency actions in general and anomalous agency procedures in particular are deterred.
In granting punitive relief, the trial court determined that the DWF seizure was prompted by an evil motive to ruin Mr. and Mrs. Bartmess. The court found further that agents effected their seizure in callous indifference to plaintiffs' federally protected rights. We may not set aside the trial court's findings of fact in absence of manifest error or unless it is clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). The apposite twotier test for reversal is as follows:

*1117 (1) the appellate court must find from the record that a reasonable factual basis does not exist for the trial court's findings; and
(2) the appellate court must further determine that the record establishes that the findings are clearly wrong (manifestly erroneous).
Lewis v. State, Through DOTD, 94-2370 (La.4/21/95); 654 So.2d 311, 314.
The record provides a reasonable factual basis to support the trial court's grant of punitive damages, and the factual determinations underlying this award are not clearly wrong.

III.

DWF Officials Are Not Protected By An Aegis Of Qualified Immunity.
Though the plain language of § 1983 does not expressly incorporate any common law immunities, the United States Supreme Court has concluded that Congress intended for common law tort principles of immunity to apply in § 1983 actions. Moresi, 567 So.2d 1081. Qualified immunity is an affirmative defense that must be plead by the defendant-official. Amato v. Office of Louisiana Com'r of Securities, 94-0082 (La.App. 4 Cir. 10/3/94); 644 So.2d 412, writ denied, 94-3024 (La.2/3/95); 649 So.2d 410. The burden of proving this immunity lies with the official asserting it. Taylor v. City of Shreveport, 26,820 (La.App. 2 Cir.); 653 So.2d 232, writ denied, 95-1131 (La.6/16/95); 655 So.2d 333.
Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 817-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). (emphasis supplied). Harlow sets forth a two-part caliper through which the court must first examine currently applicable law to determine whether the law was "clearly established" at the time the officials' action occurred. Moresi, 567 So.2d at 1085. If the law was clearly established, then the public official claiming immunity must show that, because of extraordinary circumstances, he or she "neither knew or should have known of the relevant legal standard." Id. at 1086.
Applying the foregoing principles to our qualified immunity analysis, the first question becomes whether the DWF officers' conduct in constructively seizing the Bartmess' entire farming operation violated "clearly established" statutory or constitutional rights. The Fourth Amendment guarantee against unreasonable seizures, and also the Fifth and Fourteenth Amendment guarantees that no person shall be deprived of property without due process of law are clearly established constitutional rights. See Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The trial judge concluded that the DWF's seizure violated these well established, constitutionally protected rights. This conclusion is not clearly wrong. Thus, because defendants failed to adduce evidence evincing that "extraordinary circumstances" caused them not to know the relevant legal standard, the trial court's ruling that DWF agents are not protected by the qualified immunity aegis should be affirmed.

IV.

DWF Agents Are Not Protected By An Aegis Of Good Faith Immunity.
La.R.S. 56:65 provides:
Neither the department nor any enforcing officer, agent, or other employee of the department shall incur any liability whatsoever for any search, arrest, seizure, or other act done by him in the good faith performance of his duties under this Chapter.
Appellants contend that DWF agents' conduct in constructively seizing the Bartmess' farm is protected by the good faith immunity set forth in La.R.S. 56:65. This argument prompts an analysis of whether the good faith and qualified immunity defenses trigger the same or different standards.
American jurisprudence is replete with examples of jurists employing the terms "good faith" and "qualified" immunity interchangeably. *1118 See Harlow, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396; Moresi, 567 So.2d 1081; Laverne v. Corning, 522 F.2d 1144 (2nd Cir.1975). For this reason, "good faith" and "qualified" immunity are one and the same, and each triggers the Harlow standard. For the reasons stated in Section IV of this dissent, I conclude that La.R.S. 56:65 does not protect defendants from liability.

V.

The Trial Court's Compensatory Damages Award Is Not Manifestly Erroneous.
As a result of the wrongful seizure and the wrongful revocation of the Bartmess' alligator license, plaintiffs lost their entire alligator farming operation. Bartmess lost $220,000.00 in the forced liquidation of his herd, and $115,000.00 on the catfish operation on account of the DWF seizure. The trial court awarded lost profits in the amount of $1,945,000.00. This figure was based upon Bartmess' continuing operations at pre-seizure levels (i.e., 7,200 head) with a yearly harvest of 2,880 alligators at a projected profit of $97.51 per alligator, which yields a yearly lost future profit projection of $280,828.80. The yearly lost future profit projection was multiplied by 9.5, which represents the years remaining in Mr. Bartmess' work-life expectancy, and the resulting award of $1,945,000.00 was based upon a 6.5% discount rate.
Also, as a result of the DWF seizure, Bartmess lost the lease on his Catahoula Parish farming operation, which consisted of 570 acres in ponds. Of these ponds, 31 acres were used for a brood fish operation, 87 acres were used for a fingerling operation, and 452 acres were used for a food fish operation. The court opined that Bartmess would receive $720.00 per acre in profits each year on the food fish operation, yielding a $325,440.00 yearly profit loss to Bartmess. Over the course of 9.5 years, the court projected that Bartmess would suffer $2,250,000.00 in lost profits considering a 6.5% discount rate.
The trial court's comments regarding compensatory damages are instructive:
It is apparent that the wrongful seizure by DWF agents forced Bartmess to liquidate his alligator farming operation, and Bartmess would have continued farming alligators at the levels that he was operating at the time of the seizure.

* * * * * *
The DWF further compounded and exacerbated the damages to Bartmess by denying him the alligator permits which would have allowed him to stay in business. This denial was based upon unprosecuted violations of Title 56.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the supreme court explained that:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1261.
Although the foregoing comments were framed to discuss general damages, we find the court's reasoning equally apposite to compensatory damage awards. Accordingly, I cannot say that the trial judge abused his discretion in fixing the compensatory damages award. The award was not obviously based upon passion or prejudice as it bears a reasonable relationship to the elements of the damages proved. I cannot conclude, from the entirety of the record viewed in the light most favorable to Bartmess, that a rational trier of fact could not have fixed the compensatory award at the level set by the trial judge. Likewise, I cannot conclude that this matter is an "exceptional case in which the compensatory award is so gross as to be contrary to right reason." Id. at 1261. The trial court's $4.6 million grant of compensatory relief should be affirmed in its entirety.
*1119 For the foregoing reasons, I respectfully dissent.
NOTES
[1] Because Bartmess' alligator farming permit was suspended, he was removed from the Supplemental Alligator Hatchling Program. This DWF program allowed Bartmess to receive a certain number of alligator hatchlings each year, for a maximum of 10 years, as long as he maintained a valid alligator farming permit.
[2] DWF also informed Bartmess that he had "the right" to appeal this decision by requesting an administrative hearing within 30 days of receipt of the letter. DWF also informed him that, if a hearing was requested, it would be held in Baton Rouge at a time convenient to both parties.
[3] The 11th Amendment to the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
[4] Rule F(7) of the "Alligator Regulations" issued by DWF stated:

A hide tag shall be attached in the last six (6) inches of an alligator's tail immediately upon possession by an alligator hunter. The tag shall be attached in accordance with instructions issued by the Department. Alligator farmers may wait until farm raised alligators are skinned prior to tagging. Live or dead farm raised alligators may be transported with their accompanying tags from a licensed alligator farmer to a licensed processing facility, however each shipment shall be accompanied with the exact number of alligator hide tags. Violation of this part is a class 7A violation as described in Title 56. [Emphasis added.]
Rule H(1) of the "Alligator Regulations" provides:
No person shall possess alligators or alligator hides in Louisiana without valid official tags properly attached. Failure to properly tag an alligator or hide shall result in confiscation of both the alligator or hide and tag. Violation of this part is a class 7A violation as described in Title 56. [Emphasis added.]
[5] Bartmess, on the other hand, denied that Eubanks informed him on Sunday, August 11, 1991 that his catfish operations were not affected by DWF's constructive seizure.
[6] When law enforcement officers have a right to be where they are and see contraband in "plain view," officers may seize the contraband without a search warrant. The prerequisites for a legitimate plain view seizure are: (1) there is a prior justification for police intrusion into a protected area; (2) the evidence is discovered inadvertently; and (3) it is immediately apparent without close inspection that the items are evidence or contraband. See State v. Huizar, 414 So.2d 741 (La. 1982); State v. Hernandez, 410 So.2d 1381 (La. 1982); State v. Ford, 407 So.2d 688 (La. 1981); State v. Guiden, 399 So.2d 194 (La. 1981); State v. Perrot, 600 So.2d 805 (La.App. 3 Cir. 1992); State v. Harmon, 594 So.2d 1054 (La.App. 3 Cir.), writs denied, 609 So.2d 222 (La. 1992), 623 So.2d 1326 (La.1993). In the present case, DWF agents had the right to be at Bartmess' alligator/catfish farm inspecting the alligator hides because of the federal search warrant. Also, the untagged alligator hides were inadvertently discovered; the record substantiates that DWF agents were not at Bartmess' farm to search for alleged state violations, the DWF agents were simply assisting federal agents to look for alleged federal violations. Finally, DWF agents Eubanks and Bonner both believed that the untagged alligator hides were in violation of the "Alligator Regulations."
[7] Ted Joanen has been a biologist for DWF since 1963 and supervises the 85,000 acre Rockefeller Wildlife Refuge. Joanen is responsible for initiating the alligator farming concept in Louisiana and is in charge of the statewide alligator farming program and the alligator research in Louisiana.
[8] This is not a case where DWF agents collected evidence where they clearly knew that a regulation had not been violated nor did the DWF agents knowingly and intentionally exceed their authority. Rule F(7) of the "Alligator Regulations" was subject to different interpretations regarding when an alligator was "skinned" and, thus, required a state tag to be placed on the tail.
[9] Rule O(2) of the "Alligator Regulations" provides in part that:

Following initial issuance of applicable license, all applicable facility requirements shall be adhered to and Department personnel have the authority to inspect any and all of the facilities at any time. [Emphasis added.]
Rule Q(1) of the "Alligator Regulations" provides in part that:
In order to facilitate greater control over alligator trafficking, the Louisiana Department of Wildlife and Fisheries finds that public welfare imperatively requires emergency action when the provisions of these regulations are violated. [Emphasis added.]
La.R.S. 56:55(A) provides:
The secretary or any commissioned wildlife agent may visit, inspect and examine, with or without search warrant, records, any cold storage plant, warehouse, boat, store, car, conveyance, automobile or other vehicle, airplane or other aircraft, basket or other receptacle, or any place of deposit for wild birds, wild quadrupeds, fish or other aquatic life or any parts thereof whenever there is probable cause to believe that a violation has occurred.
See also State v. McHugh, 92-1852 (La.1/6/94); 630 So.2d 1259 (State's interests in safeguarding wildlife and fisheries for benefit of the people was compelling interest which supported conclusion that statutory scheme authorizing suspicionless stops of hunters did not violate right to privacy; State Constitution, property laws, and regulatory statutes all recognized paramount importance of state's invaluable natural resources which included fish and wildlife).
[10] La.Civ.Code art. 2315 provides in part that: Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it.
[11] The October 9, 1991 letter from DWF to Bartmess stated:

Dear Mr. Bartmess:
This letter is to inform you that as a result of violations discovered by Department investigations of your alligator farm, that the above license (Non-game Quadruped Breeders License # 28787) has been revoked and that all alligator tags in your possession must be turned over to the Enforcement division of the La. Dept. of Wildlife and Fisheries.
You have the right to appeal this decision by requesting an administrative hearing within 30 days of receipt of this letter. Such a hearing if requested will be held in our Baton Rouge office at a time convenient to both parties.
Attached for your review is a copy of the alligator regulations. Page twenty eight (28) section Q. of these regulations outlines some of the penalties for violation of these rules.
[12] Rule Q(2) of the "Alligator Regulations" provides:

If citations are issued for a violation of these regulations, all licenses and tags belonging to or in the possession of the cited party shall be suspended until such time as the said party appears before Department officials for purposes of reviewing the citations issued. The Secretary, after reviewing the proceedings may reinstate or revoke the suspension. The alleged violator may lose all rights and privileges to participate in this program if found guilty by criminal or civil process.
[13] This was clearly not a seizure for forfeiture. In fact, the record substantiates that the reason for the constructive seizure on August 10, 1991 was to allow DWF agents some time to find a location to bring the untagged alligator hides that they had found at Bartmess' farm. On August 13, 1991, DWF agents transported the untagged alligator hides to DWF headquarters in Baton Rouge. Nevertheless, DWF maintained its constructive seizure on Bartmess' farm. We note that the state does not assert that Bartmess' farm was seized to be forfeited. Further, as previously stated, Rule H(1) of the "Alligator Regulations" only gives DWF agents the power to confiscate alligators and alligator hides not properly tagged.
[14] Bartmess' letter stated in pertinent part that: Formal legal demand is hereby made upon you to release the seizure of George Bartmess' farm in Franklin Parish. Your seizure has so far resulted in a very serious financial and personal damages to me. I have lost sources of credit and a substantial contract to grow hatchlings.... Written notice of your release of the seizure will be necessary for my supplier and contractor to resume business with me.
[15] This evidence came from the records of Capital Bank, who had a mortgage on Bartmess' alligator/catfish farm. Capital Bank had loaned Bartmess money to engage in alligator and catfish farming.
[16] Joanen described an alligator farm:

An alligator farm is not an outside open farm like a cattle farm or anything else. It's a controlled climate room that's heated about eighty-five degrees. And they do this for a reason. Alligators hibernate. You let them outside, they ... they hibernate for six months. But in this shed, they grow for twelve months.... That way they get some of the more efficient sheds, use a stacking concept to where they have trays, fiberglass trays stacked two and a half to three feet apart. And these alligators are put in these trays all the way up to the roof. So it's ... it's a very economical way to use the total air space in that room. And of course, fiberglass is light, but very strong, and is very smooth for the gator. And of course, that's your final product, ... is the sale of skin along with your meat, so you want to grow the best animal that you can for your final sale.
[17] This was the lowest average alligator profit per year in McNease's tables.
[18] Defendants argued that the trial court clearly abused its discretion in awarding plaintiffs future lost profits because Bartmess' Federal Income Tax Returns from 1986 to 1990 indicated that Bartmess was losing money on his farming operations. However, this same type of argument was rejected in Adkins v. Burris Mill & Feed, Inc., 93-1908 (La.App. 1 Cir. 10/7/94); 644 So.2d 839, writ denied, 94-2725 (La. 1/6/95); 648 So.2d 929 (Fact that thoroughbred racehorse farm owner had taken tax losses of approximately $1,889,000.00 in nine years prior to the deaths of 11 of his horses from ingesting moldy corn did not show that owner suffered no damages by loss of his horses, for purposes of his claims against the grain wholesaler and grain retailer; owner testified that he expected to make a profit on the farm during its "formative years," that he considered it a long-term investment, that any money won by his horses was reinvested in his farm, and that he expected it to make a profit and provide him with income by the time he retired).